Amanda CARNEY-HAYES, by her Guardian
ad Litem Thomas A. McCormack,
Walter Pietrzen and Linda Pietrzen,
Plaintiffs-Respondents-Cross-Appellants,

v.

NORTHWEST WISCONSIN HOME CARE, INC. and Kathy
Avery, Defendants-Appellants-Cross-Respondents.

Supreme Court

*No. 2003AP1801. Oral argument November 4, 2004.
—Decided July 12, 2005.*

2005 WI 118

(Also reported in 699 N.W.2d 524.)

For the plaintiffs-respondents-cross-appellants there were briefs by *Ardell W. Skow, Martha H. Heidt* and *Doar, Drill & Skow, S.C.,* Baldwin, and oral argument by *Matthew A. Biegert.*

For the defendants-appellants-cross-respondents there was a brief by *Donald K. Schott, Sarah E. Coyne, Emily M. Feinstein, O. Thomas Armstrong* and *Quarles & Brady LLP,* Madison, and oral argument by *Donald K. Schott.*

Amicus curiae briefs were filed by *Lester A. Pines, Tamara B. Packard* and *Cullen Weston Pines & Bach LLP,* Madison, on behalf of the Wisconsin Patients Compensation Fund.

An amicus curiae brief was filed by *Guy DuBeau, Joseph C. Copa* and *Axley Brynelson, LLP,* Madison, on behalf of Civil Trial Counsel of Wisconsin.

An amicus curiae brief was filed by *William C. Gleisner, III* and *Law Offices of William Gleisner,* on behalf of the Wisconsin Academy of Trial Lawyers.

¶ 1. DAVID T. PROSSER, J. This case is before the court on bypass pursuant to Wis. Stat. § (Rule) 809.60 (2001–02).[1] The plaintiff, Amanda Carney-Hayes (Carney-Hayes) and the defendants, Northwest Wisconsin Home Care Inc. and Kathy Avery (collectively, Northwest) join in this interlocutory appeal from the evidentiary rulings of the Circuit Court for Eau Claire County, Lisa K. Stark, Judge. Carney-Hayes sued Northwest, alleging that one of its employees, Kathy Avery, negligently provided emergency nursing treatment. Carney-Hayes now seeks to compel expert opinion testimony regarding the applicable standards of care from three unwilling witnesses—Avery, Cheryl Fontaine, and Jodene Verbracken. All three played a role in Northwest's treatment of Carney-Hayes, but only Avery is a named defendant. All three refused to answer certain questions posed at their depositions, asserting the privilege we recognized in *Burnett v. Alt,* 224 Wis. 2d 72, 589 N.W.2d 21 (1999), and reiterated in *Glenn v. Plante,* 2004 WI 24, 269 Wis. 2d 575, 676 N.W.2d 413.

---

[1] All subsequent references to the Wisconsin Statutes are to the 2001–02 edition unless otherwise indicated.

¶ 2. Carney-Hayes filed motions asking the circuit court to compel the three witnesses to testify on these standard of care questions. The circuit court held two separate motion hearings. At the first hearing, it granted Carney-Hayes' motion to compel Avery's testimony as to the standard of care because Avery is a named party and because "she was there," providing treatment to Carney-Hayes at the time of the incident in question. The court believed that these facts distinguished Avery from Dr. Ernesto Acosta, the unwilling expert in *Alt*, because "the *Alt* hold[ing] can be limited to a nonparty, unpaid expert."

¶ 3. At the second hearing, however, the court denied a similar motion relating to Fontaine. The court reasoned that Fontaine's position was different from Avery's because Fontaine "was not present . . . did not provide direct care to the plaintiff [and is] not a named party." Fontaine's position, in the court's view, corresponded to Dr. Acosta's position in *Alt*.

¶ 4. The circuit court characterized its decision with respect to Verbracken as the most difficult of the three, because Verbracken had previously been a direct caregiver for Carney-Hayes and had written Northwest's "plan of care" for Carney-Hayes. However, Verbracken was not at the scene of the incident, nor was she one of Carney-Hayes' direct caregivers at that time. Therefore, the court directed Verbracken to answer questions about the standard of care "with respect to the plan of care, its preparation, its maintenance, and how it should be followed." She was not required to answer questions eliciting her opinion about Avery's direct care to the plaintiff.

¶ 5. We take this opportunity to reaffirm our holdings in *Alt* and *Glenn* and to clarify the duties and privileges of medical witnesses in a medical malpractice

case. (1) A medical witness must testify about her own conduct relevant to the case, including her observations and her thought processes, her treatment of the patient, why she took or did not take certain actions, what institutional rules she believed applied to her conduct, and her training and education pertaining to the relevant subject. (2) Subject to the compelling need exception recognized in *Alt* and *Glenn,* a medical witness who is unwilling to testify as an expert cannot be forced to give her opinion of the standard of care applicable to another person or her opinion of the treatment provided by another person. Unless a medical witness who is unwilling to testify as an expert is alleged to have caused injury to the plaintiff by her medical negligence, the witness is not required to give her opinion on the standard of care governing her own conduct. (3) A medical witness who is alleged to have caused injury to the plaintiff by her medical negligence may be required to give her opinion on the standard of care governing her own conduct. A witness in this category may be a party defendant. However, no medical witness may be named a party defendant for the purpose of eliciting the witness's expert opinion. The circuit court may assess whether there is a reasonable basis for naming a medical witness as a party defendant. The court should assure that any medical witness from whom expert opinion is required is qualified to testify as an expert, pursuant to Wis. Stat. § 907.02. The court may employ evidentiary rules, including §§ 904.02, 904.03, and 906.11 to maintain the focus of a medical malpractice trial on whether the defendant conformed to the standard of care, not whether the defendant performed well as an expert witness.

## FACTS AND PROCEDURAL POSTURE

¶ 6. Carney-Hayes suffers from spina bifida and other congenital diseases.[2] She cannot breathe on her own. She is dependent on a ventilator and, at the time of the incident underlying this lawsuit, she received 24–hour home care from Northwest. At that time, Avery was Northwest's in-home "one on one" nurse, Verbracken was Carney-Hayes' "case manager" responsible for preparing care plans for treatment, and Fontaine was Northwest's "Director of Extended Care Services," a supervisor responsible for Avery's training.

¶ 7. On April 7, 1999, Carney-Hayes stopped breathing while she was at school. Avery testified that this was not an infrequent problem for Carney-Hayes, and that it was even to be expected for patients suffering from Carney-Hayes' ailments. The usual cause, according to Avery, is the inability of such patients to clear secretions from their lungs. The usual treatment is to suction the secretions out of the lungs. Avery was present at the school with Carney-Hayes, and she testified that as she prepared to suction Carney-Hayes' secretions, she noticed that Carney-Hayes had no pulse. Aided by bystanders, Avery immediately initiated cardiopulmonary resuscitation (CPR). Ultimately, Avery succeeded in saving Carney-Hayes' life, but Carney-Hayes alleges that she suffered serious injuries as a result of the incident.

¶ 8. Carney-Hayes alleges that Avery negligently failed to open her trachea before beginning CPR, and further alleges that if Avery had properly followed

---

[2] The parties have submitted a limited record for our resolution of this interlocutory appeal. Accordingly, some of the underlying facts of the lawsuit are not found in the record before us, but rather are stated by both sides in the briefs.

standard medical procedures, Carney-Hayes' heart never would have stopped. Carney-Hayes filed suit against Northwest and Avery on March 28, 2002, alleging that they were negligent in her treatment. Discovery ensued.

¶ 9. Carney-Hayes deposed Avery, Verbracken, and Fontaine. Avery's deposition took place on November 14, 2002. It lasted almost six hours and produced 173 pages of testimony. Plaintiff's counsel asked and Avery answered many questions that called for Avery's opinion and her description of her training as well as her conduct, thoughts, and observations on the date of the incident. The following exchanges took place between Avery and the plaintiff's attorney:

Q: Is that a common problem for all ventilator dependent patients . . . that they have some problems moving their secretions from their lungs?

A: They need to be suctioned periodically, yes.

. . . .

Q: I understand that you can recount the day, but I would also like you, if you can, to recount the conversation that you had with Kathy Johnson and perhaps Kelly . . . what did you tell them?

A: . . . I explained what had happened. I told them that the vent went off. I went to check on it. It said high pressure. Went to grab a suction catheter and looked at Amanda. She was cyanotic. And diaphoretic and had clear secretions coming out of her nose, mouth and trach. And at that time I reached for her brachial pulse and did not feel one. I reached for carotid pulse and did not feel one. Took her bag, dumped it out, grabbed the ambu bag, took the vent off. I threw the circuit, put the ambu bag on her trach, started ventilating her. Then I need to back up. Before—before—when I started bag-

ging her, at that time I called—I hollered for somebody to call 911. And the teacher was there by me. I had her hold onto the ambu bag and told her to squeeze it together until it met in the middle and release it so she could exhale, and do that rather fast. Unhooked her from the seat belt, straightened out her legs and we—there was somebody else there. And between the two of us, we slid her to the floor. I asked if anybody knew C.P.R. and somebody came up and started doing compressions and I was doing the bagging . . .

Q: In your opinion, did Amanda have a mucous plug on April 7th of 1999?

A: In my opinion on that day I do not know what happened.

Q: Can a mucous plug cause the trach to become obstructed?

A: It can.

Q: Can a mucous plug cause someone who is ventilator dependent to lose the ability to breathe?

A: If the trach was obstructed, yes.

Q: When you saw the secretions coming out of her mouth and her nose, as one of the things did you consider the fact that she might have an obstruction of her trachea at that point?

A: It didn't matter at that point. It was an emergency situation.

Q: The question is a little different, though, whether it mattered or not. The question is, did you consider it? . . .

A: No.

¶ 10. In addition, plaintiff's counsel asked and received answers to questions about Avery's school coursework, her clinical experience, and her on-the-job

training at Northwest. Defense counsel did not object to any of these questions. Despite these questions and answers, plaintiff's counsel claimed at the motion hearing that "Defendants in this case refused to allow Kathy Avery to express any opinions regarding her own decisions in handling the cardiopulmonary arrest event of a ventilator-dependent child."

¶ 11. Defense counsel did object to the following question:

Q: I have a number of questions that I want to ask you, Kathy, regarding the standard of care of what it is that a registered nurse would do in treating Amanda Carney-Hayes, okay?

Carney-Hayes brought the first motion to compel in response to defense objections to questions related to the standard of care.

¶ 12. Plaintiff's counsel took Verbracken's deposition on February 13, 2003. Verbracken created Northwest's "plan of care" for Carney-Hayes. Plaintiff's counsel asked about Verbracken's education, her training, the medical treatises she used, the process of creating the plan of care, and a detailed examination of the plan of care. Verbracken answered many questions calling for an expert opinion regarding what she personally would have done when faced with a hypothetical situation similar to the one that Avery faced:

Q: ... You tell me that you're familiar with what the procedures would be for initiating CPR on a trach dependent child. Could you tell us what the procedures would have been for Amanda Carney-Hayes back on April 7th, 1999?

A: That's hard to say because I wasn't there.

69

Q: Okay. And can you give us some sense of the types of decisions you would make in order to make decisions about what you would do for someone that needs CPR who is trach dependent?

A: Certainly.

Q: Okay. Tell us what that is.

A: First I would look at her and assess her for all of the things that we talked about in the care plan such as, you know, wheezes. I'd be listening for if she had secretions. Was the air actually going in when the vent was giving a breath or was it not going in? Was she purple or blue? And then I guess I need the next step first before I would make any decisions, that would be my first assessment is her air, is she—

Q: Let's assume for the purposes of the question that she's not receiving any air.

A: She's not receiving any air.

Q: She's not receiving any air. If that's the case, what would be the next step?

A: I would take her off the vent and bag her.

Q: If a person's lungs aren't moving up and down, would that be an indication of the fact that someone is not receiving air?

A: Right.

Q: And if someone is not receiving air, can one of the reasons be that a person isn't receiving air the fact that they have either a [mucous] plug or increased secretions?

A: Yes.

Q: Would one of the ways that one would have to attempt to restore air to a ventilator dependent child be to remove the increased secretions or remove the [mucous] plug by suctioning?

70

A: Yes.

¶ 13. Defense counsel objected only when plaintiff's counsel began asking questions about the applicable "standard of care." Carney-Hayes brought her second motion to compel in response to these objections.

¶ 14. Fontaine's deposition took place on February 20, 2003. Although shorter, it bears many similarities to Avery's and Verbracken's depositions. Defense counsel did not object to questions about Fontaine's education history, her training, the training procedures Fontaine used to train nurses like Avery or plaintiff's counsel's substantial questioning regarding Northwest's policies and procedures specific to "nursing cares." Defense counsel did object when plaintiff's counsel questioned Fontaine regarding the "accepted standard of care" for a manager supervising or training a nurse like Avery. Carney-Hayes incorporated her request that the court overrule these objections in her second motion to compel.

¶ 15. The circuit court ruled separately on each of the three witnesses. The court held the first motion hearing, addressing Avery's testimony, on February 5, 2003. The court held that the *Alt* privilege applied to Avery, but concluded that "there is a compelling circumstance to justify her testimony," and granted the plaintiff's motion to compel Avery to provide opinion answers to the plaintiff's standard of care questions. The court believed that compelling circumstances existed because "she was there, she has unique information, she has unique knowledge about the facts and circumstances that provide a compelling interest." The circuit court noted that the plaintiff's case would become very difficult without the sought-after testimony from Avery: "I'm certain that the case could go in without much evidence from Defendant Avery, but I

71

also think that the defense would want to put in some evidence from her concerning this issue." The court also stated its belief that the *Alt* holding was limited to nonparty, unpaid experts.

¶ 16. The second motion hearing, addressing Fontaine and Verbracken, was held on May 30, 2003. The court refused to compel expert testimony from Fontaine because it believed that factually, her position was very similar to Dr. Acosta's in the *Alt* case: she is not a named party, provided no direct care to the plaintiff, has no firsthand knowledge of what happened, and was not at the scene. Accordingly, the court denied the motion requesting that it compel Fontaine to answer questions about the appropriate standard of care and whether she believed that Avery complied with that standard.

¶ 17. At the same hearing, the court adopted a middle ground with Verbracken, essentially holding that she had to provide answers to some standard of care questions but not others. The court directed Verbracken to answer questions about the standard of care "with respect to the plan of care, its preparation, its maintenance, and how it should be followed." The court cautioned, though, that Verbracken could not be questioned about her opinion as to the standard of care applicable to Avery's direct care to the plaintiff.

## ANALYSIS

■■■

¶ 18. We must decide whether the circuit court's rulings on the permissibility of the standard of care questions were correct. We review a circuit court's evidentiary rulings under the erroneous exercise of discretion standard. *Martindale v. Ripp,* 2001 WI 113,

¶ 28, 246 Wis. 2d 67, 629 N.W.2d 698. We "will uphold a decision to admit or exclude evidence if the circuit court examined the relevant facts, applied a proper legal standard, and, using a demonstrated rational process, reached a reasonable conclusion." *Id.* However, "[w]hether a witness has a legal privilege to refuse to provide expert opinion testimony is a question of law, which we review de novo." *Glenn,* 269 Wis. 2d 575, ¶ 14 (citing *Alt,* 224 Wis. 2d at 84).

¶ 19. We begin with the well-accepted general rule that litigants have a right to every person's evidence. *Alt,* 224 Wis. 2d at 88. However, this right is not absolute; it is "tempered by constitutional, common law, or statutory privileges." *Glenn,* 269 Wis. 2d 575, ¶ 20 (citing *United States v. Nixon,* 418 U.S. 683, 709–10 (1974); *State v. Gilbert,* 109 Wis. 2d 501, 505, 326 N.W.2d 744 (1982)). In Wisconsin, this common law rule is now statutory:

> Except as provided by or inherent or implicit in statute or in rules adopted by the supreme court or required by the constitution of the United States or Wisconsin, no person has a privilege to:
>
> (1) Refuse to be a witness; or
>
> (2) Refuse to disclose any matter; or
>
> (3) Refuse to produce any object or writing or
>
> (4) Prevent another from being a witness or disclosing any matter or producing any object or writing.

Wis. Stat. § 905.01.

¶ 20. This statute, along with our common law tradition, led us to the unremarkable declaration that "Privileges are the exception, not the rule." *Alt,* 224 Wis. 2d at 85.

¶ 21. In *Alt,* the plaintiff alleged that the defendant's negligent performance during a cesarean section caused her baby to be born with "catastrophic injuries." *Alt,* 224 Wis. 2d at 79–80. The plaintiffs named a number of experts, including Dr. Acosta, who had provided prenatal care to Dawn Alt but was not present at the time of her baby's injury. *Id.* at 80. During discovery, Acosta's attorney directed him not to answer the following two questions:

> Q: And if you were the OB that was treating this woman at the time knowing that there had been an ultrasound done and wanting to see that report, what would you have done?

> Q: No matter what the cause, a patient with a history of term pregnancy and a gush of blood, that's abnormal?

*Alt,* 224 Wis. 2d at 81.

¶ 22. The *Alt* court held that Acosta did not have to answer these questions, recognizing a privilege inherent in Wis. Stat. § 907.06.[3] That statute, entitled "Court Appointed Experts," allows a circuit judge to appoint an expert, but provides that "An expert witness shall not be appointed by the judge unless the expert witness consents to act." Wis. Stat. § 907.06(1).

¶ 23. The *Alt* court held that this sentence in § 907.06(1) implied a broader privilege inherent in the statute:

[3] In *Burnett v. Alt,* 224 Wis. 2d 72, 86 n.4, 589 N.W.2d 21 (1999), the circuit court approved counsel's objection to the first question but not the second.

We conclude that this express grant implies a privilege to refuse to testify if the expert is called by a litigant. If a court cannot compel an expert witness to testify, it logically follows that a litigant should not be able to so compel an expert. It makes little if any sense to conclude that a litigant has greater rights than a court with respect to obtaining testimony from experts.

We conclude that a witness's privilege to refuse to provide expert testimony is inherent in Wis. Stat. § 907.06. Any other result would be inconsistent and fly in the face of logic.

*Alt,* 224 Wis. 2d at 86.[4]

---

[4] In *Alt,* a spirited dissenting opinion found fault with the majority's methodology. *Alt,* 224 Wis. 2d at 99 (Bradley, J., dissenting). The dissent specifically objected to the majority's belief that the privilege was inherent in Wis. Stat. § 907.06.

The existence of the privilege recognized in *Alt* is not revolutionary. We note that a similar privilege has been recognized in several other jurisdictions. *See, e.g., Young v. United States,* 181 F.R.D. 344, 346 (W.D. Texas 1997) ("In the absence of a statute to the contrary, a professional witness may not generally be compelled to testify as an expert at the request of a private litigant, as such testimony is a matter of contract or bargain."); *Agnew v. Parks,* 343 P.2d 118, 123 (Cal. App. 1959) (treating physician must testify regarding facts learned during examination and treatment of patient, but cannot be compelled to give expert opinion of standard of care or of treatment provided by another); *Mason v. Robinson,* 340 N.W.2d 236, 242–43 (Iowa 1983) (expert witness is free to refuse to provide opinion testimony absent a "compelling necessity" for the testimony); *Commonwealth v. Vitello,* 327 N.E.2d 819, 827 (Mass. 1975) ("[A] party may not by summons compel the involuntary testimony of an expert witness solely for the expertise he may bring to the trial, and in the absence of any personal knowledge on his part related to the issues before the judge and the jury"); *Klabunde v. Stanley,* 181 N.W.2d 918, 921 (Mich. 1970) ("By

¶ 24. Having recognized a privilege inherent in the statute, the court sought to define its scope. After considering the alternatives, the court adopted the test the Iowa Supreme Court articulated in *Mason v. Robinson,* 340 N.W.2d 236 (Iowa 1983). Under that test, absent a showing of compelling circumstances by the party seeking the testimony, a witness cannot be compelled to testify as an expert. *Alt,* 224 Wis. 2d at 89. If there are a number of people in a given field of expertise with similar knowledge, each capable of rendering an expert opinion on a particular question, then any one expert's opinion is not unique or "irreplaceable," and there is no compelling need for a particular expert's testimony. *Id.* at 89.

---

definition, an expert is one who gives opinion testimony, and not testimony concerning 'relevant facts.' He has a property right in his opinion and cannot be made to divulge it in answer to a subpoena."); *Stanton v. Rushmore,* 169 A. 721 (N.J. 1934) (expert may be compelled to give factual testimony but not expert opinion); *People ex rel. Kraushaar Bros. & Co. v. Thorpe,* 72 N.E.2d 165, 166 (N.Y. 1947) (real estate expert could be compelled to give testimony as to what he had seen on the premises in question, but could not be compelled to testify as to his expert opinion); *Penn. Co. for Ins. on Lives & Granting Annuities v. City of Philadelphia,* 105 A. 630, 630 (Pa. 1918) ("The process of the courts may always be invoked to require witnesses to appear and testify to any facts within their knowledge; but no private litigant has a right to ask them to go beyond that [and give expert testimony]"); *Owens v. Silvia,* 838 A.2d 881, 901–02 (R.I. 2003) ("Absent extraordinary circumstances . . . a non-party expert cannot be compelled to give opinion testimony against his or her will.") (citing *Sousa v. Chaset,* 519 A.2d 1132, 1136 (R.I. 1987)). Generally, these courts have determined that the privilege is rooted in the common law. *Id. See also Buchman v. State,* 59 Ind. 1 (1877); *Cooper v. Norfolk Redevelopment & Housing Authority,* 90 S.E.2d 788 (Va. 1956).

¶ 25. To compel an expert to testify involuntarily, a party must not only. show a compelling need for the testimony but also present a plan of reasonable compensation. *Id.* The unwilling expert may only be compelled to give existing opinions and may not be asked to undertake additional preparation. *Id.; Glenn,* 269 Wis. 2d 575, ¶ 34.

¶ 26. In *Glenn* we refined the privilege recognized in *Alt.* We reiterated that "there must be a link between a finding of compelling circumstances and the uniquely necessary or irreplaceable opinion testimony that the expert could provide." *Glenn,* 269 Wis. 2d 575, ¶ 30. In *Glenn,* the expert, Dr. Charles Koh, was a gynecologist who treated the patient, Glenn, and based on his observations, recommended that she sue one of her former providers for negligent and unnecessary treatments. *Id.,* ¶¶ 7, 17. However, Dr. Koh refused to provide expert testimony at trial, and even wrote a letter to the court noting that few doctors would want to serve as an expert witness against another local physician. *Id.,* ¶ 7.[5] This court refused to compel Dr. Koh's testimony, holding that other gynecologists could provide testimony as to the applicable standard of care. *Id.,* ¶¶ 2, 30.

¶ 27. However, the court was careful to note that Dr. Koh might still have to testify at trial:

> Even if Koh is not required to give expert opinion testimony in this case, he may be compelled to testify as to his observations as Glenn's treating physician. Such compulsion is considerably different than forcing a

---

[5] *Cf. Griffith v. Harris,* 17 Wis. 2d 255, 116 N.W.2d 133 (1962). Dr. Koh's concern is even more pressing here, where the unwilling experts are not only members of the same local medical community, but also work (or worked) in the same office.

physician to testify as to the standard of care and treatment provided by another physician. . . . [W]e emphasize that a physician can be required to testify as to his or her own observations regarding his or her care and treatment provided to the patient while serving as the patient's treating physician.

*Glenn,* 269 Wis. 2d 575, ¶ 31.

■

¶ 28. The decision in *Alt* has generated some confusion and controversy. Some of that confusion was addressed last term in *Glenn,* where we emphasized the duty of any medical witness to testify as to the facts. A medical witness may be asked about her own conduct relevant to the case, including her observations and thought processes, her treatment of the patient, why she took or did not take certain actions, what institutional rules and regulations she believed applied to her conduct, and her training and education pertaining to the relevant subject. Every person has a right to this factual evidence. *See Alt,* 224 Wis. 2d at 88.

■

¶ 29. To illustrate the sort of fact questions that a medical witness must answer, we cite the following exchange from Avery's deposition:

Q: At that point did you have, after you checked her pulse, did you have any suspicion as to why it was that she had no pulse?

A: There was a lot of things that I surmised that I thought was going on.

Q: What did you surmise?

A: I thought there was something—I was wondering if there was something wrong with the vent. I was wondering if she was having a seizure. It looked like

78

something neuro was going on. If she was having a stroke with the past history of the shunt that she had problems with. And then I was wondering if there was something cardiac that I didn't know about.

As a general rule, questions relating to a medical witness's thought processes during an incident are not objectionable.

¶ 30. Moving to a second category of witness, the heart of the *Alt* opinion is that a medical witness who is unwilling to testify as an expert cannot be forced to give her opinion of the standard of care applicable to another person or her opinion of the treatment provided by another person.

¶ 31. *Alt* deemed this ability to refuse to give an expert opinion a privilege. There are several policy reasons underlying this "privilege."

¶ 32. Early on, there were two distinct schools of thought about "expert" witnesses. One was to treat them the same as lay witnesses, requiring them to come to court as a duty of citizenship and testify for a statutory witness fee. This was the rule in *Philler v. Waukesha County,* 139 Wis. 211, 120 N.W. 829 (1909), where a "competent physician" was engaged by a criminal defense attorney to make a "careful medical examination" of the defendant and then testify as an expert witness. The county refused to pay the physician more than $1.50 per day, the statutory witness fee. The county's refusal was upheld, and the same archaic law was still being applied in 1947. *Bergstrom Paper Co. v. Cont'l Ins. Co.,* 7 F.R.D. 548 (E.D. Wis. 1947). The opposing view was well stated in *Ex parte Roelker,* 20 F. Cas. 1092 (D. Mass. 1854) (No. 11995), where the court said:

> When a person has knowledge of any fact pertinent to an issue to be tried, he may be compelled to attend, as a witness. In this, all stand upon equal ground. But to compel a person to attend, merely because he is accomplished in a particular science, [art], or profession, would subject the same individual to be called upon, in every cause in which any question in his department of knowledge is to be solved. Thus, the most eminent physician might be compelled, merely for the ordinary witness fees, to attend from the remotest part of the district, and give his opinion in every trial in which a medical question should arise. This is so unreasonable, that nothing but necessity can justify it.

This policy determination is reflected in *Alt,* where the court concluded that the law stated in *Philler* is no longer valid. *Alt,* 224 Wis. 2d 72, ¶ 37.

¶ 33. A second policy reason underlying the privilege was echoed in *Glenn* when Dr. Koh stated his reluctance to testify against a local physician. *Glenn,* 269 Wis. 2d 575, ¶ 17. There is a heavy strain on the relationships in a hospital, clinic, or other health care facility when one health care provider is required to make a public assessment under oath about another health care provider's professional performance. People understand a requirement that a witness must divulge facts; they are often more sensitive to a colleague's critical opinion. The resulting tension can destroy friendships, working relationships, and economic relationships. In the absence of necessity, there are practical reasons to avoid these familiar human problems by not requiring non-essential opinion testimony from certain witnesses. Again, *Alt* incorporated this rationale.

¶ 34. A third closely related policy reason is that the relationships among local health care providers may affect the objectivity of their testimony. Some witnesses

may have a financial stake in the outcome of malpractice litigation. As a result, they may shade their testimony to advance their own interests, guard their own reputations, or protect their co-workers.

¶ 35. Hence, unless the circumstances are exceptional, a medical witness who is unwilling to testify as an expert should not be required to give her opinion on the standard of care applicable to another person or be asked to second-guess another person's performance. In most fields, the answers to questions of this nature are not "unique" or "irreplaceable." Another "expert" in the appropriate field could answer such questions.[6]

¶ 36. This brings us to the third category, medical witnesses who have been accused of malpractice—negligence causing injury—who may be party defendants.

¶ 37. Medical malpractice cases require expert testimony to establish the standard of care. *Kuehnemann v. Boyd*, 193 Wis. 588, 214 N.W. 326 (1927). At trial, the plaintiff must establish the standard of care, show that the defendant failed to conform to the

---

[6] At oral argument, plaintiff's counsel protested that the *Alt* holding means that a party could be forced to "pay $2000 per hour" to fly in an expert if that expert and the witness are the only experts in the field.

We note that plaintiff named numerous independent experts. Plaintiff's "Notice of Expert Witnesses" listed several medics from Eau Claire Fire & Rescue; "employees of Apria," a home medical equipment supplier; four medical doctors from Luther Hospital in Eau Claire; five medical doctors from the Minneapolis Children's Medical Center; three registered nurses; a medical doctor from Cardio-Medicine, Ltd. in Minneapolis; and the school nurse on duty at Carney-Hayes' school at the time of the incident.

standard of care, and prove that the defendant's failure to conform to the standard of care caused the plaintiff's injury. *Olfe v. Gordon,* 93 Wis. 2d 173, 180, 286 N.W.2d 573 (1980).

¶ 38. A strong case can be made for the proposition that a defendant witness should not be required to address her own standard of care and that a finder of fact should compare the defendant's required factual explanation of her own actions and thought processes to the standard of care established by other experts in the field, to determine whether there was negligence.

¶ 39. Nonetheless, the rule in this state since *Shurpit v. Brah,* 30 Wis. 2d 388, 141 N.W.2d 266 (1966), has been otherwise:

> The plaintiff was permitted, both on adverse examination and in cross-examination, to inquire into what the defendant did in examination and treatment but was not allowed to inquire as to Dr. Brah's opinion as to the cause or proper treatment in view of the history and his examination of the plaintiff.
>
> We do not perceive that plaintiff should have been so limited under our adverse examination statute.
>
> . . . .
>
> While we recognize the trial court has some discretion in the scope and extent of the cross-examination of a witness, we deem it was error to prohibit cross-examination of the . . . defendant, upon the sole ground that it called for an opinion of the witness.

*Id.* at 397, 399.

¶ 40. *Shurpit* cited and quoted extensively from *Lawler v. Calaway,* 147 P.2d 604 (Cal. 1944), and *McDermott v. Manhattan Eye Hospital,* 203 N.E.2d 469

(N.Y. 1964). Innumerable cases could be cited support-
ing this rule, including *Anderson v. Florence*, 181
N.W.2d 873 (Minn. 1970), and *Jistarri v. Nappi*, 549
A.2d 210 (Pa. 1988), both of which cite *Shurpit. See also*
88 A.L.R.2d 1186 (1963), "Right To Elicit Expert Testi-
mony From Adverse Party Called As Witness."

¶ 41. The Minnesota court's thinking was set out
at length in *Anderson:*

> The medical malpractice action is a unique and
> difficult type of lawsuit. It is usually more bitter and
> contentious than an ordinary negligence suit and its
> effect on litigants is often profound. . . .

> Not only are medical malpractice actions unique;
> the defendant physician . . . is in a unique position. He
> is called upon to fill three possible roles during discov-
> ery and at trial, namely, those of an adverse party, an
> eyewitness, and an expert witness. As the adverse
> party, he, like plaintiff, can be required to testify both
> before and at trial as fully on material matters as any
> witness in any civil action. . . .

> A defendant physician in a medical malpractice suit
> is also an eyewitness and often the only person with
> firsthand knowledge of critical evidence. As such, he
> can be required to testify to facts coming under his
> observation during performance of professional du-
> ties. . . .

> [An expert witness] is the third role defendant is asked
> to assume. To testify as an expert, a witness, whether a
> nonparty or an adverse party, must be qualified, i.e.,
> found competent in the special skill or knowledge about
> which he is to testify. According to the agreed statement
> of facts in this case, defendant is a "duly qualified and
> licensed physician and surgeon in the State of Minne-
> sota, specializing in the field of orthopedic surgery."
> This stipulation compels us to accept defendant as

qualified to answer the questions propounded despite the implication that plaintiff, by instituting this action, is challenging his expertise.

... Some courts have considered it unfair and contrary to the purpose of the adverse-witness rule to allow one party to prove his case by the opposing party's expert testimony. In one sense this argument is akin to the concept that a party to a law-suit should establish his case in a "sporting" manner. But in malpractice actions the argument assumes a slightly different and more specific quality: It is unreasonable and unfair to allow a plaintiff in a malpractice action to elicit expert testimony from the defendant whose expertise he is attempting to condemn. . . . The courts assert that the question of unfairness to individuals should not be controlling, since the inquiry is directed to one who has been a participant in the occurrence and withholding relevant testimony by litigants obstructs the administration of justice. . . . Furthermore . . . the purpose of the adverse-party-witness rule "is to permit the production in each case of all pertinent and relevant evidence that is available from the parties to the action." . . . As the New York court recognized, the usual and customary medical procedures and whether defendant deviated therefrom are certainly "pertinent and relevant" to a malpractice action.

*Anderson,* 181 N.W.2d at 878–79.

¶ 42. In affirming the rule in *Shurpit,* we understand that a plaintiff may be motivated to name a medical witness as a defendant or otherwise accuse the medical witness of causal negligence in order to transform the person from an *Alt* witness (who is not required to give expert opinions) to a *Shurpit* witness who is so required. It is improper to name a person a party defendant for the purpose of eliciting an expert opinion from the person, because such a person will not

be compensated as an expert, will have to spend time preparing for testimony as an expert, and will normally have to retain counsel. Courts should not permit litigants to make end runs around *Alt* and *Glenn* by using this tactic. Accordingly, the circuit court may assess the reasonableness and good faith of a decision to make a person a *Shurpit* witness by naming the person as a defendant or otherwise accusing the witness of causal negligence.

¶ 43. The Minnesota court justified its "*Shurpit*" rule, in part, saying, "To testify as an expert, a witness . . . must be qualified, i.e., found competent in the special skill or knowledge about which he is to testify." *Id.* at 878. It added: "It should be emphasized that a defendant physician's general expertise is not on trial or in issue; the question to be resolved is whether his conduct and medical judgment in a particular case amounted to a professional mistake." *Id.* at 879. We agree.

¶ 44. Normally plaintiff's counsel will attempt to discredit a medical defendant or other medical witness accused of negligence and diminish the effect of the person's testimony by challenging the person's reliability, expertise, intelligence, and veracity in adverse examination or cross-examination. Another goal of counsel will be to prove the plaintiff's case through the defendant's "expert" testimony. The sport in turning a defendant's words against her could alter the focus of the trial.[7]

¶ 45. The circuit court must assure that a defendant/witness from whom expert testimony is required is not asked to give opinions on subjects beyond

---

[7] *See, e.g.,* Alan T. Radnor, *Cross-Examining Doctors: A Practical Guide* § 1.04, at 8–9 (1999).

the witness's competence. In other words, the witness must be qualified to answer each question asked. Wis. Stat. § 907.02. The court may also employ evidentiary rules including Wis. Stat. §§ 904.02 (relevant evidence; irrelevant evidence), 904.03 (exclusion of relevant evidence on grounds of prejudice, confusion), and 906.11 (mode and order of interrogation and presentation; control by judge) to maintain the focus of a medical malpractice trial on whether the defendant conformed to the applicable standard of care, as provided in the appropriate jury instruction, not whether the defendant performed well as an expert witness. After all, the purpose of the defendant's required testimony is to aid in the search for truth.

## APPLICATION

¶ 46.　With these guidelines in mind, we turn to the three medical witnesses in this case who were unwilling to testify as experts.

¶ 47.　The first medical witness, Kathy Avery, is a named defendant and is accused of causal negligence. She was Carney-Hayes' primary home care nurse. Avery was with Carney-Hayes during the incident underlying the lawsuit, and her actions are of critical importance in determining whether the suit will succeed. Under these circumstances, Avery must testify about her own conduct relevant to the case, including her observations and thought processes, her treatment of the patient, why she took or did not take certain actions, what institutional rules and regulations she believed applied to her conduct, and her training and education pertaining to the relevant subject. An examination of the deposition transcript shows that she did

so. *See supra* ¶¶ 9, 29. As we have noted, Avery was extensively questioned about her education and training, and gave a detailed description of the events during the incident, including her observations, her actions, and her rationale for her behavior.

¶ 48. Further, Avery was asked a series of questions intended to determine the extent of her knowledge about ventilator-dependent patients, many of which included hypothetical questions and called for opinion answers. Avery answered all these questions without objection. The following exchange illustrates some of these questions:

Q: Did they give you any instruction at all as to what you should be doing once that high pressure alarm would go off on a ventilator dependent patient?

A: I don't remember any formal instructions. The first thing would be always to check the patient.

Q: And when you say check the patient, what do you mean by check the patient?

A: Check for color, check to—overall assessment to see how they're doing.

Q: After having made that assessment, what would be the next step?

A: Just—well, it depends on what their assessment was. If it didn't sound like they needed a suctioning, there was no secretions, their color was pink, they were alert, you would probably silence the alarm.

¶ 49. Then plaintiff's counsel attempted to question Avery about the appropriate standard of care. We conclude that Avery was required to answer questions about the standard of care governing her conduct because she is accused of negligence and is central to the case.

87·

¶ 50. We affirm the circuit court on this question but for different reasons. The *Alt* privilege does not apply to Avery because, as a defendant accused of causal negligence, she is a *Shurpit* witness.

## JODENE VERBRACKEN

¶ 51. Jodene Verbracken was Northwest's "case manager" for Carney-Hayes and had previously been a direct caregiver for her. She must testify as to her own conduct in preparing the Northwest "plan of care" for Carney-Hayes. She must testify regarding references she used in preparing that plan and why she felt the plan was appropriate for Carney-Hayes. If relevant, she must testify about her past care of the plaintiff. However, she cannot be forced to testify to the general standard of care for preparing a similar plan of care, nor may she be forced to testify whether she believes Avery's conduct conformed to the standard of care.

¶ 52. We tend to see Verbracken as an *Alt* witness. Like Dr. Acosta and Dr. Koh, Verbracken had provided direct care to the patient but was not present at the time of the unfortunate incident. Her expert opinion is not unique or irreplaceable. No exceptional circumstances require her testimony.[8]

¶ 53. Verbracken is not accused of causal negligence. In discovery, the plaintiff obtained the plan of care that Verbracken prepared for Carney-Hayes and

---

[8] "[I]t is a well-settled rule of law that employee-experts who acquire information for trial solely because they were actors or viewers with respect to the occurrences forming the subject matter of the lawsuit must be treated as ordinary fact witnesses, and *not* as experts." *Young,* 181 F.R.D. at 346.

Verbracken must explain that plan of care. Verbracken is not a unique or irreplaceable witness for establishing the standard of care for such plans.

¶ 54. Although a case manager may be negligent in preparing a plan of care, it is not evident from the limited record before us whether Carney-Hayes is alleging that Verbracken negligently prepared the care plan. We are unwilling to permit the mere possibility of such an allegation to transform a normal *Alt* witness into a *Shurpit* witness and require that witness to assume burdens beyond the burden of being a fact witness.

¶ 55. An *Alt* witness who is unwilling to testify as an expert may not be compelled to answer a hypothetical question aimed at establishing the witness's perception of her own standard of care or a general standard of care. Such a question would be akin to the question we held impermissible in *Alt:* whether a gush of blood is abnormal under any circumstances in an expectant mother with a history of term pregnancy. It can often be transposed into the standard of care applicable to another person, pitting one against the other.

¶ 56. We note that impermissible questions about the standard of care, phrased hypothetically or otherwise, may easily be transformed into permissible questions about the specific conduct of the medical witness. For example, plaintiff's counsel asked Verbracken the following impermissible question:

> Q: Does the standard of care require that this care plan be reviewed and periodically updated?

¶ 57. The question would have been permissible if plaintiff's counsel had instead asked:

> Q: Did you periodically update and review the care plan for Amanda Carney-Hayes?

In fact, plaintiff's counsel asked—and Verbracken answered—a similar question:

> Q: And does Northwest require that this care plan be reviewed and updated on some periodic basis?
>
> A: Yes.
>
> Q: How frequently is the care plan, first of all, to be reviewed?
>
> A: I don't recall for sure, but I believe it was on a monthly basis.

¶ 58. After a medical witness has described her own conduct, the plaintiff may establish the applicable standard of care through independent experts, and then show that the person's conduct did not meet that standard. Thus, hypothetically, if the plaintiff's experts established that a care plan should be reviewed weekly, Verbracken's testimony quoted in the preceding paragraph would show that Northwest's monthly updates did not satisfy the standard of care.

¶ 59. On the basis of the record in front of us, the circuit court erred in requiring Verbracken to answer questions about the standard of care "with respect to the plan of care, its preparation, its maintenance, and how it should be followed." Nonetheless, in light of this decision, we remand this case to the circuit court so that the plaintiff has the opportunity to allege that Verbracken is a *Shurpit* witness because she was negligent or the plan of care she prepared was defective.

## CHERYL FONTAINE

¶ 60. Cheryl Fontaine is Northwest's "Director of Extended Care Services." She must testify about her own actions, any training she provided to Avery, and

any of Northwest's corporate training standards she believed governed her actions. However, she cannot be forced to testify to the general standard of care required of a nursing supervisor, nor may she be forced to testify whether she believes Avery's conduct conformed to the applicable standard of care. On Fontaine's testimony, we affirm the circuit court.

## CONCLUSION

¶ 61. We reaffirm our decisions in *Alt* and *Glenn* and take this opportunity to clarify the duties and privileges of witnesses in a medical malpractice case. (1) A medical witness must testify about her own conduct relevant to the case, including her observations and her thought processes, her treatment of the patient, why she took or did not take certain actions, what institutional rules she believed applied to her conduct, and her training and education pertaining to the relevant subject. (2) Subject to the compelling need exception recognized in *Alt* and *Glenn,* a medical witness who is unwilling to testify as an expert cannot be forced to give her opinion of the standard of care applicable to another person or her opinion of the treatment provided by another person. Unless a medical witness who is unwilling to testify as an expert is alleged to have caused injury to the plaintiff by her medical negligence, the witness is not required to give her opinion on the standard of care governing her own conduct. (3) A medical witness who is alleged to have caused injury to the plaintiff by her medical negligence may be required to give her opinion on the standard of care governing her own conduct. A witness in this category may be a party defendant. However, no medical witness may be named a party defendant for the purpose of eliciting the

91

witness's expert opinion. The circuit court may assess whether there is a reasonable basis for naming a medical witness as a party defendant. The court should assure that any medical witness from whom expert opinion is required is qualified to testify as an expert, pursuant to Wis. Stat. § 907.02. The court may employ evidentiary rules, including §§ 904.02, 904.03, and 906.11 to maintain the focus of a medical malpractice trial on whether the defendant conformed to the standard of care, not whether the defendant performed well as an expert witness.

¶ 62. We affirm the circuit court's evidentiary rulings with respect to Kathy Avery and Cheryl Fontaine. We reverse the circuit court's evidentiary ruling with respect to Jodene Verbracken. By misapplying our holdings in *Alt* and *Glenn* with respect to Verbracken, the circuit court erroneously exercised its discretion. We remand the cause for further proceedings consistent with this opinion.

*By the Court.*—The orders of the circuit court are affirmed in part and reversed in part and the cause is remanded.

¶ 63. JON P. WILCOX, J. (*concurrence*). Although I agree with the result the majority opinion reaches, I write separately because I believe the majority opinion and concurrence/dissent, in their attempt to explore the boundaries of the expert privilege recognized by this court in *Burnett v. Alt,* 224 Wis. 2d 72, 589 N.W.2d 21 (1999), and reaffirmed last term in *Glenn v. Plante,* 2004 WI 24, 269 Wis. 2d 575, 676 N.W.2d 413, may be losing sight of the forest through the trees. Thus, I write separately to set forth some clear rules regarding the analysis to be employed in applying the expert privilege, in hopes of providing guidance to litigants and judges dealing with this seemingly difficult area of the law.

¶ 64. I begin by restating a basic proposition recognized by Justice Butler's concurrence/dissent: experts in Wisconsin are qualified on a question-by-question basis. Justice Butler's concurrence/dissent, ¶ 101 (quoting 7 Daniel D. Blinka *Wisconsin Practice: Wisconsin Evidence* § 702.4, at 490 (2d ed. 2001)). The first step in the *Alt* analysis is thus whether the question posed to the witness calls for an expert opinion. *Alt,* 224 Wis. 2d at 82. "A question asks for expert testimony if it requires 'scientific, technical, or other specialized knowledge,' Wis. Stat. § 907.02 (1993–94), to answer the question." *Id.* at 83 (footnote omitted).

¶ 65. If the question does not call for an expert opinion, but rather asks a witness to testify as to his or her personal observations—i.e., calls for a witness to testify as to facts—the *Alt* privilege does not apply. *Id.* at 87 (noting that even under the absolute privilege the court ultimately rejected, "the witness is only required to testify regarding his or her observations, just as any other witness"); *id.* at 87 (noting that under the qualified privilege the court adopted, a witness cannot, absent compelling circumstances, be forced "to give *expert testimony*")(emphasis added); *id.* at 90 (ruling that Dr. Acosta must testify "as to his observations" regarding the prenatal care he provided to Dawn Alt). *See also, Glenn,* 269 Wis. 2d 575, ¶ 2 (clarifying that "*Alt* does not apply to observations made by a person's treating physician . . . but rather applies to expert testimony . . . "); *id.,* ¶ 28 ("[A] treating physician may still be required to testify regarding his or her *observations* relating to the care or treatment provided to his or her patient[.]").

¶ 66. If, on the other hand, the question calls for expert testimony, then the witness has a qualified

93

privilege to refuse to answer the question. *Alt,* 224 Wis. 2d at 89 ("[W]e hold that absent a showing of compelling circumstances, an expert cannot be compelled to give expert testimony whether the inquiry asks for the expert's existing opinions or would require further work."). *See also Glenn,* 269 Wis. 2d 575, ¶ 26 (reaffirming the qualified privilege set forth in *Alt).*

¶ 67. The difficulty in applying *Alt* and *Glenn* is apparently determining of what constitutes "compelling circumstances." In *Glenn,* we clarified that "[t]he compelling circumstances should focus on whether there is unique or irreplaceable *opinion testimony* sought from an expert . . . ." *Glenn,* 269 Wis. 2d 575, ¶ 2 (emphasis added). However, it is often asserted that there is a compelling need for a witness to provide an expert opinion because they have unique factual knowledge based on their personal observations. *See, e.g.,* Justice Butler's concurrence/dissent, ¶ 96 n.6. In my opinion, such assertions confuse the second prong of the *Alt* inquiry with the first prong.

¶ 68. As already discussed, the *Alt* privilege does not apply to questions that call for non-expert testimony, i.e., factual knowledge. " '[U]nlike factual testimony, expert testimony is not unique and a litigant will not be usually deprived of critical evidence if he cannot have the expert of his choice.' " *Alt,* 224 Wis. 2d at 89 (quoting *Mason v. Robinson,* 340 N.W.2d 236, 242 (Iowa 1983)). When courts are analyzing whether compelling circumstances are present, they must have necessarily already determined that the question calls for expert testimony, not factual knowledge. As noted by this court in *Alt:* "An expert's testimony is generally based on applying the expert's specialized knowledge to a certain set of facts to then draw conclusions and render an opinion." *Id.* at 88–89.

¶ 69. Because witnesses are qualified on a question-by-question basis, the fact that an expert witness may *also* have unique factual knowledge due to his or her personal observations simply has no bearing on whether there is a compelling need for his or her answer to a question calling for an opinion based on those facts. This is so because regardless of whether there are compelling circumstances so as to force an expert to provide an *opinion* in response to a question, a witness is *always* required to provide *factual testimony* under *Alt* and *Glenn*. "Even if Koh is not required to give expert opinion testimony in this case, he may be compelled to testify as to his *observations* as Glenn's treating physician." *Glenn,* 269 Wis. 2d 575, ¶ 31 (emphasis added). The pertinent question is whether there is a compelling need for a witness' expert *opinion* regarding a set of established facts.

¶ 70. This conclusion was explicitly recognized by the court in *Alt:*

> Dr. Acosta may be unique with respect to the prenatal care provided to Dawn Alt and he must testify as to his observations in that role. However, he does not appear to be unique with respect to the question asked [whether it was abnormal for a patient with a history of term pregnancy to have a gush of blood]. *Dr. Acosta's prenatal care of Dawn Alt and authoring her discharge summary make him no more and no less qualified than any other obstetrician to give an expert opinion about whether a gush of blood in a patient who has a history of term pregnancy is abnormal.*

*Alt,* 224 Wis. 2d at 90 (emphasis added). Thus, the fact that a witness has crucial factual testimony regarding his or her own observations is irrelevant for purposes of determining whether there is a compelling need for his

or her expert opinion regarding the significance of those facts.

¶ 71. The appropriate inquiry as to whether compelling circumstances are present focuses "on whether there is unique or irreplaceable *opinion testimony* sought from an expert . . . ." *Glenn,* 269 Wis. 2d 575, ¶ 2 (emphasis added). As we stated in *Alt,* 224 Wis. 2d at 89: "As appears to be the case here, *there can be a number of people within a field with similar specialized knowledge capable of rendering an expert opinion on the question or questions asked. In such instance, the opinion of one particular expert is not irreplaceable.*" (Emphasis added.)

¶ 72. In other words, under *Alt* and *Glenn,* a doctor or nurse is always required to answer questions relating to his or her personal observations or factual knowledge concerning the care of a particular patient. *Alt* and *Glenn* simply do not apply to questions calling for factual testimony. The same witness may be forced to answer a question calling for the witness to render an expert opinion based on those facts, if there is a compelling need for such testimony. A compelling need is present if such testimony is irreplaceable, such as when there are not other individuals in the relevant field qualified to answer the question. Conversely, if there are "a number of people within a field with similar specialized knowledge capable of rendering an expert opinion on the question or questions asked[,] . . . the opinion of one particular expert is not irreplaceable[,]" *Alt,* 224 Wis. 2d at 89, and compelling circumstances are not present. Further, the fact that a witness qualified as an expert may have unique factual knowledge in the form of personal observations regarding the care and treatment of a patient "make[s] him [or her] no more and no less qualified than any [expert in the

relevant field] to give an expert opinion about [those facts]." *Id.* at 90. Finally, the "procedural aspects of the case" have no bearing on whether compelling circumstances are present. *Glenn,* 269 Wis. 2d 575, ¶ 2.

¶ 73. If such compelling circumstances are present, then the witness may be forced to render an expert opinion if two additional requirements are met. First, the party seeking testimony must present a plan for reasonable compensation for the expert. *Id.,* ¶ 2; *Alt,* 224 Wis. 2d at 89. Second, the expert can be compelled only to provide existing opinions and cannot be required to do additional preparation. *Glenn,* 269 Wis. 2d 575, ¶ 2; *Alt,* 224 Wis. 2d at 89. Thus, if the witness has not formed the opinion necessary to answer the question and would be required to perform additional work to render such an opinion, his or her testimony as to that opinion may not be compelled.

¶ 74. In sum, a proper *Alt/Glenn* analysis is as follows: 1) Does the question call for the witness to render expert testimony or simply answer a factual question based on personal knowledge and/or observation?; 2) If the question calls for the witness to render an expert opinion, are there compelling circumstances for such testimony independent of the procedural posture of the case or any factual testimony the witness may have provided, such as where there are no other individuals qualified to render the opinion for which the question asks?; 3) Has the party requesting the testimony provided a reasonable plan of compensation?; and 4) Will the witness be required to perform additional work in order to develop an opinion he or she has not yet formed?

¶ 75. ANN WALSH BRADLEY, J. *(concurring in part, dissenting in part).* This court's decision in *Burnett v. Alt,* 224 Wis. 2d 72, 589 N.W.2d 21 (1999) left much uncertainty in its wake. Seminars were con-

97

ducted to explore its meaning, committees were established to curb the abuses proliferating from its application, and articles from both the defense bar and plaintiffs' bar appeared decrying the confusion.[1]

¶ 76. We attempted to clarify the nature and extent of the *Alt* privilege in *Glenn v. Plante,* 2004 WI 24, 269 Wis. 2d 575, 676 N.W.2d 413. There, we an-

---

[1] For example:

- State Bar of Wisconsin Litigation Section, *Litigation News,* Vol. 30, No. 1, Winter 2004 (litigation section board activities in 2004 included "[r]eviewing practice issues and abuses arising from application of the decision in *Burnett v. Alt*").

- 2004 Tort Seminar, sponsored by Wisconsin Academy of Trial Lawyers, December 3 & 4, 2004 (Friday Morning Sessions - "Hot Topics": 8:30 a.m. *Alt v. Cline* - presentation by Lynn R. Laufenberg).

- Michael P. Russart, *Just the Facts, Ma'am: Glenn v. Plante and the Reluctant Expert,* Wisconsin Civil Trial Journal, Fall 2004.

- Minutes of the State Bar Board of Governors, July 11, 2003, p. 4 (President Burnett appointed committee to "study and report on . . . special problems presented by *Alt v. Cline*.").

- State Bar of Wisconsin Litigation Section Board of Directors Minutes, Teleconference, June 30, 2003 ("It was agreed by those present that the interpretation being given *Alt* by physicians and other experts as well as trial and appellate courts affected all litigation practitioners within the state. A request from the State Bar was received for funding of a committee chaired by Attorney Marie Stanton of Madison to study the *Alt* issue with an eye towards proposing a new rule or legislation needed to remediate the *Alt* interpretations.").

- Timothy J. Aiken, David M. Skoglind and William C. Gleisner, III, *Why Alt v. Cline Violates the Constitutional Rights of Plaintiffs,* Wisconsin Academy of Trial Lawyers, "The Verdict," (Vol. 26:3, Summer 2003).

- Patrick O. Dunphy, Ramifications of *Alt v. Cline,* presented at the State Bar of Wisconsin Annual Convention Litigation Section, May 2, 2001.

nounced that "*Alt* does not apply to observations made by a person's treating physician regarding the care and treatment provided to the patient, but rather applies to expert testimony from such a physician as to the standard of care and treatment provided by another physician." *Glenn,* 269 Wis. 2d 575, ¶ 2.

¶ 77. Now the instant case is before us, again requiring clarification of the *Alt* doctrine. Unfortunately, rather than clarify, the majority has added to the confusion. With this opinion, lower courts and practicing attorneys are left with something just short of a Byzantine maze. Accordingly, I write separately to express regret for not only what the court is doing, but what it has failed to do.

¶ 78. Here is what the court has done: The bench and bar will have to learn new categories of witnesses. The first is an *ordinary "medical witness."* These witnesses must testify about their own conduct relevant to the case, including their observations and thought processes, treatment of the patient, why they took or did not take certain actions, what institutional rules they believed applied to their conduct, and their training and education pertaining to the relevant subject. Majority op., ¶ 5.

¶ 79. The second category is an "*Alt medical witness.*" Subject to the compelling need exception recognized in *Alt,* these witnesses cannot be forced to give their opinion of the standard of care applicable to another person or their opinion of the treatment provided by another person. *Id.* These witnesses also cannot be required to give an opinion on the standard of care governing their own conduct. *Id.*

¶ 80. Finally, the third category is a "*Shurpit medical witness.*" These witnesses differ from the previous two kinds in that they are alleged to have caused

injury to the plaintiff by their medical negligence. *Id.* As a result, they may be required to give their opinion on the standard of care governing their own conduct. *Id.*

¶ 81. In addition, the majority sets forth duties for the circuit court. It would have the circuit court "assess the reasonableness and good faith of a decision to make a person a *Shurpit* witness by naming the person as a defendant or otherwise accusing the witness of causal negligence." *Id.,* ¶ 42. It mandates that the circuit court "assure that a defendant/witness from whom expert testimony is required is not asked to give opinions on subjects beyond the witness's competence." *Id.,* ¶ 45. The court explains that such a mandate means "[i]n other words, the witness must be qualified to answer each question asked." *Id.* Additionally, the majority instructs that the circuit court "may employ evidentiary rules, including §§ 904.02, 904.03, and 906.11 to maintain the focus of a medical malpractice trial on whether the defendant conformed to the standard of care, not whether the defendant performed well as an expert witness." *Id.,* ¶ 5.

¶ 82. Essentially the court has failed to clarify the *Alt* morass. The majority opinion seems to raise more questions than it answers:

- Does the opinion apply only to medical witnesses, or does it apply to all expert witnesses?

- Even though an expert witness may not be required to opine on the standard of care question, can the witness still be required to give expert testimony in response to other questions?

- Can an *Alt* witness be transformed into a *Shurpit* witness? Can a *Shurpit* witness be transformed into an *Alt* witness? How does such a transformation take place?

- If a hospital is accused of causal negligence, why are not all of its agents/employees who worked with the patient potential *Shurpit* witnesses?

- If the heart of the *Alt* opinion is that a medical witness cannot be forced to give her opinion of the standard of care applicable to another person, why cannot an *Alt* witness be asked to give an opinion of the standard of care applicable to herself?

¶ 83. Ultimately, what the majority has failed to do is set forth a simple standard for all medical witnesses: (1) No witness, except a voluntary expert witness, should be forced to testify about someone else's standard of care. (2) Any witness may testify about his or her own standard of care regardless of whether the person is a named party and regardless of any allegation of negligence, as long as that testimony is relevant.

¶ 84. In light of the majority opinion, I have no doubt that *Alt* issues will continue to plague the litigants and courts of this state. Inevitably we will see these issues again. For the foregoing reasons, I respectfully concur in part and dissent in part.

¶ 85. I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON and Justice LOUIS B. BUTLER join this opinion.

¶ 86. LOUIS B. BUTLER, JR., J. (*concurring in part, dissenting in part*). I respectfully dissent in part. I would conclude that Carney-Hayes should be allowed to ask two of the witnesses here, Avery and Verbracken, about their own standards of care, provided Carney-Hayes can qualify them as experts. I would conclude that the answers to these questions are not privileged under *Burnett v. Alt,* 224 Wis. 2d 72, 589 N.W.2d 21 (1999), and this court's decision just last term in *Glenn v. Plante,* 2004 WI 24, 269 Wis. 2d 575, 676 N.W.2d 413.

¶ 87. Before jumping into the analysis, the following background provides context. Carney-Hayes has filed suit against Northwest Wisconsin Homecare, Inc., and Avery. Carney-Hayes has alleged that on April 7, 1999, Carney-Hayes suffered injury while under the custody, care, supervision, and/or treatment of Avery. Carney-Hayes alleged that her injuries and resulting damages were caused by negligence of Northwest, its agents, servants, ostensible agents, and/or employees, and/or Kathy Avery.

¶ 88. During discovery, the following disputes arose:

> Carney-Hayes wants to ask Avery (Carney-Hayes' registered nurse) about her standard of care.

> Carney-Hayes wants to ask Verbracken (Carney-Hayes' case manager who wrote Carney-Hayes' plan of care) about her standard of care and about Avery's standard of care.

> Finally, Carney-Hayes wants to ask Fontaine (a supervisor responsible for Avery's training) about what a manager's standard of care was regarding orienting a nurse to a new patient and whether Avery acted according to the standard of care.[1]

---

[1] Carney-Hayes has not asked Fontaine any questions requiring expert opinions about her own conduct. To the extent Carney-Hayes wants to ask Fontaine to levy opinions about another's standard of care, I agree that these questions fall under the *Burnett v. Alt,* 224 Wis. 2d 72, 589 N.W.2d 21 (1999), privilege. If Fontaine were asked about her own standard of care, I would conclude that these questions are not privileged under *Alt* for the same reasoning that applies to Avery and Verbracken. Before the answer to that question would be admissible, however, Carney-Hayes would have to first qualify Fontaine to answer the question and would have to proffer a theory of relevance. Because

¶ 89. Turning to *Alt,* one of the issues in that case was whether an expert witness had a legal privilege to refuse to answer questions posed that required expert opinions. *Alt,* 224 Wis. 2d at 82. In that case, Cline, an obstetrician, delivered a child, Cody Alt, after performing a cesarean section on the mother, Dawn Alt. *Id.* at 79–80. Cody sustained serious injuries from the delivery. *Id.* at 80. The Alts (Cody, Dawn, and the father, Mark), sued Cline for negligence. *Id.* The Alts named one of Cody's treating physicians, Acosta, as an expert. *Id.* Acosta provided prenatal care to Dawn and wrote her discharge summary following Cody's birth, but he was not present at the delivery. *Id.* During discovery, the Alts asked Acosta a question that called for an expert opinion. *Id.* at 81, 84. Specifically, the question was, "No matter what the cause, a patient with a history of term pregnancy and a gush of blood[,] that's abnormal?" *Id.* at 81 (brackets in original). Acosta refused to answer the question.[2]

¶ 90. This court recognized that as a general rule, no person has a privilege to refuse to give evidence.[3] *Id.*

Fontaine has not yet been asked about her own standard of care, it is academic to consider issues surrounding Fontaine at this time.

[2] Dr. Acosta was directed not to answer the question by his attorney. *Burnett v. Alt,* 224 Wis. 2d 72, 81, 589 N.W.2d 21 (1999).

[3] According to Wis. Stat. § 905.01:

Except as provided by or inherent or implicit in statute or in rules adopted by the supreme court or required by the constitution of the United States or Wisconsin, no person has a privilege to:

(1) Refuse to be a witness; or

(2) Refuse to disclose any matter; or

(3) Refuse to produce any object or writing; or

(4) Prevent another from being a witness or disclosing any matter or producing any object or writing.

at 84. The *Alt* court also recognized that "[p]rivileges are the exception, not the rule." *Id.* at 85.

¶ 91. Nevertheless, this court found an implicit expert-privilege in Wis. Stat. § 907.06(1). *Alt,* 224 Wis. 2d at 86. That section provides that "[t]he judge may appoint any expert witnesses agreed upon by the parties, and may appoint witnesses of the judge's own selection. An expert witness shall not be appointed by the judge *unless the expert witness consents to act.*" *Id.* (emphasis in original). The *Alt* court concluded that "this express grant implies a privilege to refuse to testify if the expert is called by a litigant." *Id.* Because a court cannot compel an expert witness to testify, this court determined that "it logically follows that a litigant should not be able to so compel an expert." *Id.*

¶ 92. This "unearthed and hitherto unknown privilege permitting expert witnesses to decline to give opinions against their will," 7 Daniel D. Blinka, *Wisconsin Practice: Wisconsin Evidence,* § 702.7, at 514 (2d ed. 2001), was not limitless, however. Striking a balance "between the right of expert witnesses to be free from testifying against their will and the needs of the court and litigants for testimony," *Alt,* 224 Wis. 2d at 88, this court outlined the parameters of this newly created broad qualified expert privilege as follows:

> [A]bsent a showing of compelling circumstances, an expert cannot be compelled to give expert testimony whether the inquiry asks for the expert's existing opinions or would require further work. In addition to demonstrating a compelling need for the expert's testimony, the party seeking the expert's testimony must present a plan of reasonable compensation. Finally, if the party seeking an expert's opinion is able to show a compelling need for the expert's opinion, an expert can

only be compelled to give existing opinions. Under no circumstances can an expert be required to do additional preparation.

*Id.* at 89 (footnote omitted).

¶ 93. Applying this privilege to Acosta, this court concluded that Acosta did not have to answer the question presented because he was no more or less qualified than any other obstetrician to give an expert opinion regarding the question asked. *Id.* at 90. However, Acosta did have to testify as to his observations regarding Dawn's prenatal care. *Id.*[4]

¶ 94. This court revisited *Alt* last term in *Glenn.* In that case, Glenn's gynecologist, Plante, performed various surgical procedures to treat abdominal pain.[5] *Glenn,* 269 Wis. 2d 575, ¶ 4. Glenn visited another physician, Koh, after the procedures. *Id.* Koh told Glenn that the procedures were unnecessary, and Glenn then sued Plante for negligence. *Id.,* ¶¶ 4–5. However, Glenn failed to timely name her expert witnesses, so Glenn named Koh. *Id.,* ¶ 6. Koh objected, stating that he did not want to be part of a malpractice action against a fellow local physician. *Id.,* ¶ 7.

¶ 95. At issue in *Glenn* was whether there were "compelling circumstances" to justify requiring Koh to give expert opinion testimony regarding the standard of care and treatment provided by another physician. *Id.,* ¶¶ 14, 22. This court concluded that there were not, as

---

[4] This court stated: "Dr. Acosta may be unique with respect to the prenatal care provided to Dawn Alt and he must testify as to his observations in that role." *Alt,* 224 Wis. 2d at 90.

[5] Those procedures included a laparotomy with a right ovarian cystectomy, a right oophorectomy, and hysterectomy. *Glenn v. Plante,* 2004 WI 24, ¶ 4, 269 Wis. 2d 575, 676 N.W.2d 413.

compelling circumstances are linked to "the uniquely necessary or irreplaceable opinion testimony that the expert could provide." *Id.,* ¶ 30. Koh's testimony on another physician's standard of care was not uniquely necessary since other experts could likely testify as to this issue. *Id.* However, this court concluded that Koh could be "compelled to testify as to his observations as Glenn's treating physician. Such compulsion is considerably different than forcing a physician to testify as to the standard of care and treatment provided by another physician." *Id.,* ¶ 31.

¶ 96. In sum, both *Alt* and *Glenn* involved questions that required the treating physicians to offer opinions about another physician's treatment. This court in *Glenn* characterized *Alt* as concluding that "Acosta was not so unique as to be required to answer a deposition question that required his expert opinion about another physician's treatment." *Id.,* ¶ 27 (citing *Alt,* 224 Wis. 2d at 90). And in *Glenn,* this court concluded that "a treating physician may still be required to testify regarding his or her observations relating to the care or treatment provided to his or her patient, as such compulsion is considerably different than forcing a physician to testify as to the standard of care and treatment provided by another physician."[6] *Glenn,* 269 Wis. 2d 575, ¶ 28.

---

[6] It is error for the trial court to limit cross-examination of a medical expert witness upon the sole ground that the questions called for expert opinions. *Shurpit v. Brah,* 30 Wis. 2d 388, 397, 399, 141 N.W.2d 266 (1966). In *Shurpit,* this court stated as follows:

> While we recognize the trial court has some discretion in the scope and extent of the cross-examination of a witness, we deem it was error to prohibit cross-examination of the expert witnesses, including the defendant, upon the sole ground that it called for an opinion of the witness.

¶ 97. Outside of these types of questions, I would conclude that the rules of evidence govern the scope of questioning. I begin with the general proposition that, subject to other rules, all relevant evidence is admissible. Wis. Stat. § 904.02.[7] If a witness is qualified as an expert under Wis. Stat. § 907.02, that witness can testify to scientific, technical, or other specialized knowledge if it will assist the trier of fact to understand the evidence or determine a fact in issue. In addition, testimony in the form of an opinion or inference that is otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact. Wis. Stat. § 907.04.

¶ 98. I recognize that *Alt* found an implicit privilege under Wis. Stat. § 907.06. Under that section, an expert witness "shall not be appointed by the judge unless the expert witness consents to act," Wis. Stat. § 907.06(1), and is compensated, Wis. Stat. § 907.06(2). While I may not have reached the same conclusion *Alt* did based on this particular statute, I accept the holdings of *Alt* and *Glenn* under principles of stare decisis. Because privileges are the exception and not the rule, however, *see* Wis. Stat. § 905.01, I would not extend this implicit privilege beyond the circumstances of *Alt* and

---

We have concluded it was error to restrict the cross-examination of the defendant and his expert witness so as to prohibit their opinions as to the quality of the care and treatment rendered by the defendant to the plaintiff.

*Id.* at 399–00.

[7] Wisconsin Stat. § 904.02 provides:

All relevant evidence is admissible, except as otherwise provided by the constitutions of the United States and the state of Wisconsin, by statute, by these rules, or by other rules adopted by the supreme court. Evidence which is not relevant is not admissible.

*Glenn.* Under those cases, an expert witness cannot be compelled to testify as to another's standard of care.

¶ 99. An expansive reading of this privilege undermines many rules of evidence (discussed above) and disregards the parties' right and ability to effectively cross-examine witnesses. As we recently stated, "Cross-examination has been described as the greatest legal engine ever invented for the discovery of truth." *State v. Stuart,* 2005 WI 47, ¶ 26 n.7, 279 Wis.2d 659, 695 N.W.2d 259 (quoting *California v. Green,* 399 U.S. 149 (1970) (citation and quotations omitted).[8]

¶ 100. Consistent with these principles, and beginning with the proposition that evidentiary privileges are to be narrowly construed, *see Glenn,* 269 Wis. 2d 575, ¶ 20, I would conclude that under *Alt* and *Glenn,* Avery and Verbracken do not have a privilege to refuse to answer questions regarding their own standard of care. In contrast to the circumstances presented in *Alt* and *Glenn,* we are confronted with persons who are already testifying material fact witnesses, who may also be experts. To the extent that Carney-Hayes wants to ask them about their own standard of care as it relates to the treatment that that particular witness provided to Carney-Hayes, she should be allowed to do so. As the *Glenn* court suggested, this compulsion "is considerably different than forcing a physician to testify as to the standard of care and treatment provided by another physician." *Id.,* ¶ 28. It is one thing to force an expert to take the stand and render an opinion about what someone else did, it is quite another to ask a fact witness on the stand questions that relate to his or her

---

[8] I respectfully disagree with the sentiments expressed in the majority opinion regarding cross-examination. *See* majority op., ¶ 44.

own conduct. I would not extend the *Alt* privilege beyond that which was identified in *Glenn*.

¶ 101. That said, before Carney-Hayes can ask the questions, she bears the burden, as the proponent of the evidence, of qualifying each witness to answer the questions. *See* Wis. Stat. § 907.02. Whether an expert is qualified to offer an opinion is a discretionary determination that rests with the trial court. *Simpsen v. Madison Gen. Hosp. Ass'n,* 48 Wis. 2d 498, 509, 180 N.W.2d 586 (1970). Although the witnesses here may have various sorts of expertise, "the witness[es] must be qualified for each and every question." 7 Daniel D. Blinka, *Wisconsin Practice: Wisconsin Evidence,* § 702.4 at 490 (2d ed. 2001).

¶ 102. If Carney-Hayes qualifies Avery and Verbracken to answer the standard of care questions with respect to their own conduct, I would also conclude that the responses to those questions are relevant. An ultimate issue of fact in a negligence case is whether the jury believes that the defendants (one of which includes the home care provider that employed Avery and Verbracken) acted according to the standard of care. *See Nowatske v. Osterloh,* 198 Wis. 2d 419, 433–34, 438–39, 543 N.W.2d 265 (1996); *Ceplina v. South Milwaukee Sch. Bd.,* 73 Wis. 2d 338, 342, 243 N.W.2d 183 (1976). The jury will first have to resolve what the standard of care is. If Avery and Verbracken have opinions on what the standard of care is with respect to their own conduct, and whether their own actions conformed to that standard of care, that is all evidence that cuts to the heart of Carney-Hayes' claims.

¶ 103. Thus, because *Alt* does not apply to questions posed to already testifying material fact witnesses regarding their own standard of care, I would conclude that Carney-Hayes should be allowed to ask both Avery

and Verbracken[9] about their own standards of care, provided Carney-Hayes can qualify them as experts. Assuming they can be qualified, I would conclude that the witnesses can be compelled to answer as those questions are relevant to an ultimate issue of fact. I would also conclude that neither Verbracken nor Avery could be compelled to answer questions about any other person's standard of care, as these questions fall precisely within the holdings of *Alt* and *Glenn*.

¶ 104. Accordingly, I would affirm the decision and order of the trial court in all respects. For the foregoing reasons, I therefore respectfully dissent from that portion of the majority opinion with respect to Verbracken. I concur with the result reached by the majority opinion with respect to Avery and Fontaine.

¶ 105. I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON and Justice ANN WALSH BRADLEY join this opinion.

---

[9] Alternatively, I would agree with the trial court's conclusion that Verbracken is required to answer questions about the standard of care with respect to the plan of care, its preparation, its maintenance and how it should be followed because she was a caregiver for Carney-Hayes and the person who wrote the plan of care that was followed by Avery.