In the

# United States Court of Appeals

## For the Seventh Circuit

No. 23-2204

ARMIN WAND, III,

*Plaintiff-Appellant,*

*v.*

BECKEY KRAMER,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:18-cv-00500-wmc — **William M. Conley**, *Judge.*

ARGUED APRIL 2, 2024 — DECIDED JULY 15, 2025

Before ROVNER, HAMILTON, and SCUDDER, *Circuit Judges.*

HAMILTON, *Circuit Judge.* This appeal deals with the challenges a district court faces when a prisoner sues prison officials alleging inadequate medical care under the Eighth Amendment to the United States Constitution and/or state law of negligence. Plaintiff Armand Wand III was a Wisconsin prisoner when he developed appendicitis in February 2018. When a prison nurse, defendant Beckey Kramer, first saw Wand on February 13, 2018, she did not immediately

diagnose appendicitis or any other condition requiring emergency treatment. When she saw Wand again the next day, on February 14, she recognized that he probably had appendicitis. She immediately contacted a doctor, and within minutes she sent Wand to a hospital for emergency care and surgery. Without a lawyer, Wand brought this suit against Nurse Kramer and other officials. He seeks damages from Nurse Kramer for failing to recognize that he needed emergency care in that first visit on February 13. A jury found in favor of Kramer after a trial in which Wand did not have a lawyer. His lack of a lawyer presents the issue in this appeal.

After denying summary judgment on claims against Kramer and another defendant, the district court managed to recruit for Wand an experienced personal-injury lawyer. The lawyer was willing to accept the appointment only for the limited purpose of helping Wand try to settle the case. After that attempt was not successful, the court granted the lawyer's motion to withdraw. Plaintiff then filed his last motion seeking recruitment of another lawyer, this time to try the case. That last motion was the first writing that alerted the court that plaintiff is legally blind and has a severe stutter, which would pose unusual challenges for plaintiff representing himself in an already challenging jury trial focused on prison health care.

The district court denied that final motion. Without deciding whether that denial was an abuse of discretion, we find that plaintiff has not shown prejudice such that reversal for a new trial could be required. See generally *Pruitt v. Mote*, 503 F.3d 647, 659–60 (7th Cir. 2007) (en banc) ("Even if a district court's denial of counsel amounts to an abuse of its discretion, we will reverse only upon a showing of prejudice."). We reach

this conclusion primarily because of the substantive weakness of plaintiff's case. Plaintiff testified at trial that he first told Nurse Kramer only on February 14, not February 13, that his severe abdominal pain was located in the lower right quadrant, consistent with appendicitis. His trial testimony on this point contradicted his earlier claims, but it was clear and consistent on this key point. He could not credibly disavow that testimony. We also see no reasonable prospect that a second recruited lawyer could have found a qualified expert to testify that Nurse Kramer's response to Wand's symptoms on February 13—without acute abdominal pain in the lower right quadrant—was a negligent or deliberately indifferent response to a serious medical emergency. We therefore affirm the district court's judgment for defendant Kramer pursuant to the jury's verdict.

## I. *Plaintiff's Abdominal Pain and Emergency Appendectomy*

We take the facts primarily from the trial record, drawing where needed from the pleadings and summary judgment record. Plaintiff Armin Wand III is a Wisconsin prisoner. Around 6:00 p.m. on February 12, 2018, Wand started to experience stomach pain. By 11:30 p.m., the pain intensified and he began vomiting. Wand testified that he reported his symptoms to Correctional Officer Leonard Johnson around midnight. According to Wand, Johnson walked off without a response.[1]

---

[1] Johnson testified at trial that he did not recall any interaction with Wand that evening. The district court had found a material factual dispute and denied Johnson's motion for summary judgment. The jury ruled in favor of Johnson, and in an earlier appeal, we affirmed that verdict. *Wand*

Around 7:30 the next morning, February 13, Wand reported to another correctional officer that he was still having severe stomach pain and had been vomiting. He asked for a referral to the prison's health services unit. The officer called health services, and Wand was placed on the list to be seen that day by prison medical staff. Wand was eventually sent to the health services unit around 2:30 p.m. He was seen twenty minutes later by defendant Beckey Kramer, a registered nurse at the facility.

That February 13 examination is the crux of the case. Everyone agrees that the next day, February 14, Wand saw Nurse Kramer again and complained of severe abdominal pain in his lower right quadrant, and that Nurse Kramer responded appropriately. She immediately contacted a physician, who directed her to send Wand to a hospital right away. Wand was on his way to a local hospital within minutes, and he quickly had emergency surgery for a ruptured appendix. Wand's claim against Kramer is that she should have recognized a day earlier, on February 13, that he needed emergency attention and that her failure to do so amounted to negligence under state law and/or deliberate indifference under the Eighth Amendment.

The parties' pretrial accounts of Kramer's initial examination of Wand on February 13 agreed on many facts but differed on one key point. Wand and Kramer agree that he told Kramer he was unable to keep food down, he could not sleep because of his stomach pain, and his level of pain was ten on a scale of one to ten. All of that is reflected in Kramer's clinical

---

*v. Kramer*, No. 22-1989, 2023 WL 4045242 at *5 (7th Cir. June 16, 2023). Wand's claim against Johnson is not at issue in this appeal.

notes and both parties' trial testimony. Before trial, however, in his complaint, discovery responses, and summary judgment briefing, Wand asserted that he also told Kramer during that February 13 visit that his severe pain was located on the right side of his abdomen near his appendix and that he believed the pain was caused by his appendix. See Dkt. 15 at 5, ¶8 (amended complaint).

Kramer's account differed on that key point about localized pain. She testified that on February 13, Wand said his pain was focused on his stomach, above his navel, and not in the lower right quadrant. She also testified, consistently with her clinical notes, that his vital signs on February 13 were within normal limits, his abdomen was soft and non-distended, he had bowel sounds present in all four quadrants, and his lips were dry.

Based on those symptoms and her nursing experience, Kramer testified, she believed Wand's symptoms on February 13 were gastrointestinal with a potential for dehydration. She did not believe his symptoms signaled appendicitis or any other urgent condition that would require immediate consultation with a physician.

As the February 13 examination ended, Kramer provided Wand an order for Pepto Bismol to settle his stomach, acetaminophen for pain, and ice chips for dehydration. (Prisoners were not allowed ice chips without a medical order.) She also ordered that he be placed on a liquid diet and rest for two days with no work or recreation. She scheduled him for a follow-up appointment two days later and told him to notify the health services unit if his symptoms worsened.

Wand returned to his cell. He continued to suffer from severe pain all that night of February 13 and into the next day, February 14. In the late afternoon of February 14, Wand's condition had deteriorated to the point that he called over the prison intercom that he needed to go to the hospital. He was escorted to the health services unit, where Kramer saw him again at approximately 5:45 p.m. Kramer observed that Wand needed help to walk, was holding (in medical parlance, "guarding") his lower right abdominal quadrant, and was grimacing. Kramer testified that Wand said his nausea and vomiting had stopped overnight, but that the pain had localized to his lower right quadrant on the afternoon of February 14. Kramer took Wand's vital signs. They had worsened from the day before. These changes, especially the pain localized in the lower right quadrant, were indications of appendicitis. Kramer contacted the physician on call, who ordered that Wand be sent to the nearest hospital emergency room immediately. Kramer made the arrangements, and Wand was taken to the nearest hospital fifteen minutes after he arrived at the clinic.

At the hospital, doctors determined that Wand's appendix had ruptured, and he underwent surgery. While he was still recovering at the hospital, a CT scan revealed a buildup of fluids in his stomach and lungs. On February 21, Wand was transferred to a larger hospital for management of an abdominal abscess and a buildup of excess fluid around his right lung. Wand received antibiotics, as well as placement of an abdominal drain and insertion of a chest tube. Two weeks after the surgery, on February 28, Wand's chest tube was removed, and he was discharged from the hospital and returned to prison.

II. *Pre-Trial Proceedings*

Wand filed this case under 42 U.S.C. § 1983 and state law seeking compensation for pain and suffering resulting from what he claimed was the delayed treatment of his appendicitis by Kramer and others. After the court screened the amended complaint under 28 U.S.C. § 1915A, the case proceeded against Nurse Kramer and several other prison officials on Eighth Amendment and state-law negligence claims based on allegations that those defendants failed to respond adequately to his symptoms that turned out to be appendicitis.

With help from other inmates, Wand filed over two dozen pretrial motions in the district court before the denial of his final motion for recruited counsel. These included a motion for leave to proceed in forma pauperis, motions for leave to amend his complaint, and motions for summary judgment. Wand also responded to defense motions, including a motion to dismiss and motions for summary judgment.

During the pretrial proceedings, other inmates also helped Wand file several motions for recruitment of counsel. Those motions made no mention of Wand's vision impairment or his stutter, and they said little about the case other than that it was a medical case that would be difficult to handle pro se. The district court denied those motions on familiar grounds, including the limited availability of volunteer counsel, but always without prejudice to reconsideration in case circumstances changed.

In the summer of 2020, all defendants who were still in the case moved for summary judgment. In a detailed order, the court granted summary judgment for another defendant but

denied summary judgment for defendants Kramer and Johnson. *Wand v. Kramer*, No. 18-cv-500-WMC, 2021 WL 311285, at *5–8 (W.D. Wis. Jan. 29, 2021). In the summary judgment evidence, there was a factual dispute about whether Wand had complained to Kramer of lower right quadrant pain on February 13. The district court reasoned that if a jury believed Wand's (pretrial) account of that examination, it could find that Kramer's response amounted to deliberate indifference in violation of the Eighth Amendment.[2]

At the end of the summary judgment order, facing the prospect of a jury trial against Johnson and Kramer, the district judge returned to the issue of recruiting counsel for Wand. The court wrote that Wand had "ably and aggressively litigated this case, and the court continues to believe that he has a clear command on the relevant facts and legal standards." *Id.* at *8. The court thought Wand could manage to try his claim against Johnson, which would not require expert testimony but only resolution of his and Johnson's conflicting accounts of what happened the evening of February 12. The court recognized, though, that the claim against Nurse Kramer would be more challenging because it might require expert testimony on the standard of care. Wand had told the court that he had tried but failed to secure an expert witness. The court also recognized that doing so would be especially difficult for an incarcerated pro se litigant. Accordingly, the

---

[2] In the January 29, 2021 order, the district court granted summary judgment for Kramer and Johnson on Wand's state-law negligence theory based on a failure to provide a notice required by statute, *Wand*, 2021 WL 311285 at *8, but later realized the notice requirement did not apply. The court reinstated the theory on November 23, 2021. Dkt. 243 at 3–4.

court granted Wand's motion for recruitment of counsel. *Id.* at *9.

The court's order did not indicate an intention to recruit counsel for only mediation. In fact, it discussed recruited counsel's role in retaining an expert "for purposes of trial." *Id.* Two weeks later, however, the court issued an order appointing an experienced trial attorney to represent plaintiff only "for the limited purpose of representing plaintiff at least through the mediation process." Dkt. 217. The order also said that if mediation were not successful, the lawyer could choose whether to continue or stop representing plaintiff. The court warned plaintiff that he would need to work with the recruited lawyer and that, if plaintiff preferred not to work with that lawyer, "it is highly unlikely that the court will recruit a second attorney to represent him." *Id*. at 2.

The attorney reported to the court that he had spent considerable time with Wand but was not successful in resolving the case. He told the court he wished to withdraw as counsel for plaintiff. The court granted the lawyer's motion to withdraw and thanked him for his time and effort. The record does not contain anything more specific from the attorney, but plaintiff later complained that the attorney had recommended that he settle for a sum that would have "barely covered the cost of the filing fees, copies, postage and hours I spent litigating the case."

III. *Wand's Final Motion for Recruitment of Counsel*

After recruited counsel withdrew, Wand filed his final motion for recruitment of counsel, which also requested help in finding expert witnesses. He supported the motion with his most detailed brief on the subject, along with affidavits from

himself, his brother, and Marcellous L. Walker, a fellow in-
mate who called himself a jailhouse lawyer. This was the first
motion in which he told the court about his legal blindness
and stuttering.[3]

Wand argued that his "physical and neurological" disabil-
ities surpassed "the general difficulties ascribed to incarcer-
ated litigants." His stutter "causes him … more often than not
to take as long as one minute or more to say a simple phrase
or to ask a simple question." Wand "is also legally blind,
which causes him to hold any written material to his nose and
which takes far more time than what it would normally take
even a person with simply poor reading vision." He also ar-
gued that appointment of both counsel and a medical expert
was required because his claims involved "the untreated, de-
layed or inappropriate response to the plaintiff's … serious
medical issues," proof of which "almost *always* require[s] the
assistance of experienced counsel." He noted that, "[a]s
demonstrated through discovery, in this case," there is "a
question of [the] professional standard of care." As an alter-
native to recruiting a new lawyer, Wand asked the court to
allow his brother, also an inmate at the same facility, to repre-
sent him at trial.

Wand's supporting affidavit included records confirming
his status as legally blind and reminded the court of his "se-
vere speech impediment," which "presents in the form of
stutters and pauses which has been a life-long issue." Wand's
brother said that Wand "relied upon [him] and other[s] to

---

[3] Our count of Wand's motions does not match his or the district
court's, and the count is muddied a bit by motions to reconsider denials.
We focus on his final motion, Dkt. 235, and the court's denial, Dkt. 243.

read written or typed materials, or to re-write certain things in thick, black marker, in larger print so that he could better make out the shapes of the letters and words." Walker said that other prisoners seek his "assistance in drafting their legal materials and help in understanding the processes involved in criminal and civil procedure." Walker said he had helped Wand with his case and noted Wand's reliance on other jail-house lawyers, calling Wand a "layman" with "very little, hardly ANY knowledge about civil litigation."

On November 23, 2021, the district court denied Wand's final motion for recruitment of counsel and for recruitment of expert witnesses. The court's reasoning for declining to try to recruit an expert overlapped with its reasons for declining to recruit counsel. The court noted that "the most crucial evidence related to [Wand's] claims against defendants were likely to be what Wand himself told each of them and their individual responses." Dkt. 243 at 2. Thus, "Wand does not need an expert to present the evidence most crucial to his claims: he can testify about his interactions with Johnson and Kramer; and he can cross-examine each of them about those interactions." *Id.*

The court recognized the need to establish the requisite standard of care but noted that everyone agreed "that lower right quadrant pain would be a symptom of appendicitis." In denying further recruitment of counsel, the judge wrote that he would "permit Wand to question Kramer as an adverse expert, so that he can establish the appropriate standard of care." *Id.* "Although not a perfect solution, this appears to be the best path forward, given recruited counsel's declining to pursue an expert further and the likelihood that an expert's

opinion would not differ as to the basic standard of care from that of Nurse Kramer." *Id*. at 2–3.

In response to Wand's argument that his speech impediment and legal blindness called for recruitment of counsel and an expert about his impairments, the court wrote: "Wand's physical limitations have nothing to do with his desire to recruit a medical expert and by themselves do not justify recruitment of another pro bono counsel." *Id*. at 3. Instead, the court promised to "grant Wand the time and leniency he needs to explain himself and present his case in a fair way and … instruct the jurors about the nature of Wand's limitations, as well as explain both at voir dire and during trial that these limitations must not interfere with their consideration of the evidence." *Id*. at 3. The court reasoned from its "prior interactions" with Wand that he had thus far "litigated this case aggressively and demonstrated a clear understanding of the applicable legal standards and this court's procedures." *Id*. at 3. Consequently, it considered him "more than capable of representing himself" with the benefit of the court's guidance. *Id*. at 3.[4]

IV. *Wand's Performance at Trial*

After his motion to recruit trial counsel was denied, Wand prepared for trial with help from other inmates. He reached out to 21 doctors in an effort to retain a medical expert. But only one even responded, and none were willing to offer their services. Wand also struggled to contact lay witnesses and to

---

[4] The district judge at that point had seen Wand in person only once, but Wand had appeared before the magistrate judge numerous times. We have no reason to doubt that the district and magistrate judges communicated about the case.

prepare them for trial. He was repeatedly unable to comply with procedural requirements for obtaining subpoenas and writs of habeas corpus ad testificandum.

The three-day trial began on the morning of May 23, 2022. Wand's stutter interfered with his reading of his opening statement to such an extent that the district judge stopped him and offered to read the remainder of it for him. Wand accepted. In substance, the opening statement was clear, concise, and focused on the issues. Some of Wand's witnesses (inmates appearing by video) were unprepared. They took the stand unaware of the subject matter of the trial. All, however, remembered Wand's illness and his efforts to obtain medical care.

At other times, Wand was unable to follow the rules of evidence. He did not understand the need for an immediate objection if he thought defense evidence was not admissible. Wand waited to raise one objection until the court called for a side bar—at which point he was told that he had missed his opportunity to object. He also struggled with the rules for admitting trial exhibits, and the judge explained to him, in front of the jury, what he was and was not allowed to do with exhibits. His examination of witnesses also drew a number of interventions by the court. During Wand's first direct examination, for example, the judge interrupted nine times to clarify what Wand had said or to pursue a more helpful line of questioning. The same thing happened during Wand's examination of Nurse Kramer. The judge intervened fourteen times to ask a question or to clarify Wand's comments or the testimony. The judge intervened in similar ways with defense counsel, though not as often, to clarify testimony for the jury

and to guide counsel toward proper use of exhibits and at-
tempts to impeach.

After two days of evidence, the jury deliberated for ap-
proximately two and a half hours. It returned a verdict for
Kramer on both counts, finding that Kramer did not violate
Wand's Eighth Amendment rights and that she was not neg-
ligent in caring for him.

Still acting without a lawyer, Wand appealed, raising over
thirty distinct issues with the district court proceedings. We
screened the appeal and affirmed the district court's disposi-
tive rulings on all claims except his claim against Kramer.
*Wand v. Kramer*, No. 22-1989, 2023 WL 4045242 (7th Cir. June
16, 2023). We requested additional briefing and oral argument
on (1) whether the district court abused its discretion by deny-
ing Wand's final motion to recruit counsel and (2) whether
that denial caused reversible prejudice to Wand. We recruited
appellate counsel for those purposes, and we address those
issues in turn.[5]

V.  *Analysis*

   A.  *Standard for Recruiting Counsel*

As a rule, lawsuits work better when the parties are repre-
sented by lawyers. But in most civil cases where a prisoner
claims he has been denied health care or received inadequate
care, the prisoner is indigent and unable to find a lawyer will-
ing to take his case. The prisoner-plaintiff has no statutory or
constitutional right to a lawyer in such a civil case, and a court

---

[5] We thank attorneys Michael Heckmann, Alex Potapov, and Lauren
Shelepak and the law firm of Jones Day for their generous and able assis-
tance to their client and to the court.

has no power to compel a lawyer to represent the plaintiff. See *Pruitt*, 503 F.3d at 653, citing *Mallard v. United States District Court*, 490 U.S. 296, 310 (1989). Federal law provides, though, that the court "may" try to recruit counsel for the prisoner-plaintiff. 28 U.S.C. § 1915(e)(1).

"[T]he language of § 1915(e)(1) is entirely permissive; it says the court 'may' request an attorney to represent a person unable to afford counsel." *Pruitt*, 503 F.3d at 654. The statute's "language suggests no congressional preference for recruitment of counsel in any particular circumstance or category of case. Instead, the decision whether to recruit pro bono counsel is left to the district court's discretion." *Id.*, citing *Johnson v. Doughty*, 433 F.3d 1001, 1006 (7th Cir. 2006); *Farmer v. Haas*, 990 F.2d 319, 323 (7th Cir. 1993).

In exercising its discretion under section 1915(e)(1), a district court should first ask whether the plaintiff has made reasonable efforts on his own to find a lawyer. If those efforts are not successful, and they usually are not, district courts should ask, "given the difficulty of the case, does the plaintiff appear competent to litigate it himself?" *Pruitt*, 503 F.3d at 654, citing *Farmer*, 990 F.2d at 321–22. This second question focuses on both the nature of the case and the plaintiff's abilities and limitations.

Few if any prisoner-plaintiffs can present their cases to a jury as effectively as a lawyer. Rarer still is the indigent prisoner-plaintiff who can, without a lawyer, locate and engage a medical expert to testify that the care he received violated an applicable standard of care. Yet in many prison health-care cases, a plaintiff will need testimony from a medical expert to prevail. Thus, virtually any indigent prisoner challenging his medical care can seem, at least superficially, to satisfy the two

steps of the *Pruitt* analysis so that it would seem to be an abuse of discretion not to try to recruit counsel. We have made clear, however, that there is no categorical rule requiring recruitment of counsel in health-care cases. 503 F.3d at 656 ("we have resisted laying down categorical rules regarding recruitment of counsel in particular types of cases"); accord, *James v. Eli*, 889 F.3d 320, 328 (7th Cir. 2018) (no one factor is necessary or conclusive). We have also made clear that a district court may evaluate the likely merits of a case when deciding whether some of the finite resource of volunteer lawyer time should be devoted to the particular case. E.g., *Watts v. Kidman*, 42 F.4th 755, 763–66 (7th Cir. 2022); *McCaa v. Hamilton* ("*McCaa II*"), 959 F.3d 842, 845 (7th Cir. 2020); *Pruitt*, 503 F.3d at 663 (Rovner, J., concurring).

These discretionary and case-specific decisions are often difficult, but they are still subject to review for abuse of that discretion. In the rare case where we find an abuse of discretion, we will still reverse only if the plaintiff was prejudiced by the error. To show prejudice, a plaintiff does not need to show he probably would have won with a lawyer, but he must show "a *reasonable likelihood* that the presence of counsel would have made a difference in the outcome of litigation." *Pruitt*, 503 F.3d at 659; accord, e.g., *McCaa v. Hamilton* ("*McCaa I*"), 893 F.3d 1027, 1034 (7th Cir. 2018); *Henderson v. Ghosh*, 755 F.3d 559, 566 (7th Cir. 2014). We reject claims of prejudice "when it is clear that counsel could have done nothing to salvage the plaintiff's case." *Eagan v. Dempsey*, 987 F.3d 667, 687 (7th Cir. 2021).

To show an abuse of discretion, a party must show "(1) the record contains no evidence upon which the court could have rationally based its decision; (2) the decision is based on an

erroneous conclusion of law; (3) the decision is based on clearly erroneous factual findings; or (4) the decision clearly appears arbitrary." *Pruitt*, 503 F.3d at 658, quoting *Musser v. Gentiva Health Services*, 356 F.3d 751, 755 (7th Cir. 2004). "A trial court can also abuse its discretion 'when it overlooks essential evidence or fails to consider relevant factors.'" *James*, 889 F.3d at 328, quoting *Jardien v. Winston Network, Inc.*, 888 F.2d 1151, 1159 (7th Cir. 1989).

Wand's efforts to obtain counsel himself are not disputed here, so we focus on the district court's assessment of Wand's ability to present his case at trial. Although the inquiry into the plaintiff's competence and the difficulty of the case is necessarily specific to the individual and the circumstances, we have identified the factors that are typically most relevant:

> There are no fixed requirements for determining a plaintiff's competence to litigate his own case; the judge will normally take into consideration the plaintiff's literacy, communication skills, educational level, and litigation experience. To the extent there is any evidence in the record bearing on the plaintiff's intellectual capacity and psychological history, this, too, would be relevant. To inform the decision, the judge should review any information submitted in support of the request for counsel, as well as the pleadings, communications from, and any contact with the plaintiff. We recognize that the volume of pro se prisoner cases is great, and in some cases—perhaps many cases—the record may be sparse. The inquiry into the plaintiff's capacity to handle his own case is a practical

one, made in light of whatever relevant evidence is available on the question.

Likewise, there are no hard and fast rules for evaluating the factual and legal difficulty of the plaintiff's claims. We have previously observed that some cases—those involving complex medical evidence, for example—are typically more difficult for pro se plaintiffs. See *Zarnes v. Rhodes*, 64 F.3d 285, 289 n.2 (7th Cir. 1995). But because the decision belongs to the district court, we have resisted laying down categorical rules regarding recruitment of counsel in particular types of cases. *Id.* at 288–89 (refusing to recognize a rule of "automatic appointment of counsel whenever a litigant alleges a violation of due process"). There are no presumptions for or against recruitment of counsel, whether based on the nature of the case or the degree of plaintiff competence. The inquiry into plaintiff competence and case difficulty is particularized to the person and case before the court. It is undertaken with due regard for the nature of the request at hand; before a judge will invoke his discretionary authority to press a lawyer into service on an indigent plaintiff's case pro bono, he first rules out the possibility that the plaintiff is competent to litigate it himself.

*Pruitt*, 503 F.3d at 655–56 (footnote omitted).

Apropos of this case, our cases recognize that the medical nature of a case and a plaintiff's physical impediments are factors that certainly weigh in favor of trying to recruit counsel,

especially for a jury trial. See *Pennewell v. Parish*, 923 F.3d 486, 491–92 (7th Cir. 2019) (reversing denial of counsel); *James*, 889 F.3d at 329–31 (same); *Dewitt v. Corizon, Inc.*, 760 F.3d 654, 658, 660 (7th Cir. 2014) (same); *Henderson*, 755 F.3d at 566, 568 (same).

The district court "can only make a determination based on the record as it exists when the motion is brought, and our review is limited to the record at the time the decision was made .…" *Pruitt*, 503 F.3d at 656. "Although it is tempting to consider the evidence postdating the court's ruling—especially where (as here) the pro se plaintiff's trial performance is particularly incompetent—this evidence [is] … improper on abuse-of-discretion review." *Id.* at 659. "If the judgment was sensible when made, the fact that after the trial it is apparent that the plaintiff was not competent to try the case after all will not establish error." *Farmer*, 990 F.2d at 322, citing *McCarthy v. Weinberg*, 753 F.2d 836, 838 (10th Cir. 1985). "As with any discretionary determination, the question on appellate review is not whether we would have recruited a volunteer lawyer in the circumstances, but whether the district court applied the correct legal standard and reached a reasonable decision based on facts supported by the record." *Pruitt*, 503 F.3d at 658. In the next section, we apply the standard from *Pruitt* to the district court's denial of Wand's final motion to recruit counsel.

B. *The Denial of Plaintiff's Final Motion to Recruit Counsel*

By the time Wand was approaching trial before a jury, his final motion presented the district court with a difficult problem. Wand faced all the usual challenges of an indigent, pro se prisoner with limited (eleventh-grade) education and no prior litigation or trial experience. His challenges would be

enhanced by the nature of the case against Nurse Kramer, where the focus would be whether she responded properly to his symptoms on February 13, and where expert testimony would be either helpful (on one theory) or indispensable (on a second theory). Further, Wand's final motion told the judge for the first time in writing that he was legally blind and had a severe stutter. Both conditions would be additional obstacles at trial.

Those factors all weighed in favor of trying to recruit another lawyer for Wand, as the court's order recognized. But other factors weighed against trying to recruit another lawyer, beyond the scarcity of willing lawyers. The court had previously recruited an experienced lawyer for Wand. After an attempt to settle, that lawyer had withdrawn. Like the district court, we are grateful for that attorney's time and effort. Reading between the lines, though, we can infer that he was not willing to commit to represent Wand through trial. The district court's order saying it would try to recruit counsel had not said that the appointment would be limited to mediation. The judge, we are sure, would have preferred to have counsel in the case for all purposes, especially for trial. The more limited appointment would have been what the attorney was willing to take on. The judge left open the possibility that if the case did not settle, the lawyer might decide the case was strong enough that he should take on the trial and possible recruitment of an expert as well. But that did not work out. Moreover, any further efforts to recruit a new lawyer would have faced a new obstacle. Any new candidate would have wanted to know from the first attorney why he had chosen not to pursue the case further. If Wand had such a good case, why had the first attorney withdrawn?

So trying to recruit another lawyer looked problematic, and the judge considered what he could do without another lawyer. Recognizing Wand's vision impairment and stutter, the judge wrote that he would "grant Wand the time and leniency he needs to explain himself and present his case in a fair way" and would "instruct the jurors about the nature of Wand's limitations, as well as explain both at voir dire and during trial that these limitations must not interfere with their consideration of the evidence." Dkt. 243 at 3. That is indeed what happened. The district judge was quite active during trial, interrupting examinations by both sides to clarify the evidence and to keep the evidence focused on what mattered. We have no doubt that these accommodations were less than ideal, certainly as compared to having a veteran lawyer handle the trial, but they were not insignificant.

Having Wand question Nurse Kramer on the relevant standard of care was also not an ideal solution, as the judge noted. But Nurse Kramer acknowledged that if the facts were as Wand had claimed before trial—if he told her on February 13 his severe pain had localized in the lower right quadrant of his abdomen—then she should have responded differently. Given that common ground, the critical issue for Wand's claim against Kramer—on both Eighth Amendment and negligence theories—was the factual issue of what he told her and what she observed about his pain on February 13. That factual dispute did not necessarily require expert testimony to resolve.

In addition, having a plaintiff rely on a defendant medical provider to establish the standard of care is "not a novel concept." *Johnson*, 433 F.3d at 1008 n.6 (affirming denial of recruited counsel in medical deliberate indifference case).

Wisconsin law allows this method to establish the standard of
care in medical malpractice cases. *Carney-Hayes v. Northwest
Wisc. Home Care, Inc.*, 2005 WI 118, ¶¶ 36–39, 284 Wis. 2d 56,
81–82, 699 N.W.2d 524, 537 (2005), quoting *Shurpit v. Brah*, 30
Wis. 2d 388, 397, 399, 141 N.W.2d 266 (1966).

One might question aspects of the district court's ap-
proach to this difficult recruitment of counsel issue—includ-
ing whether its written order sufficiently addressed all rele-
vant factors, and in particular Wand's reliance before trial on
help from other inmates who would not be available to help
during trial. But we must assess the court's exercise of discre-
tion in light of the practical alternatives actually available. The
options were limited, and none was optimal. In the end,
though, this appeal can be resolved without deciding whether
the district judge abused his discretion in declining to make a
further attempt to recruit counsel for plaintiff—a close ques-
tion, to be sure. The decisive issue is whether Wand was prej-
udiced by that decision. He was not.

C. *Prejudice*

Even if we assumed the district court abused its discretion
in denying Wand's final motion for recruitment of counsel, we
would reverse only if the plaintiff was prejudiced by the error.
See, e.g., *McCaa I*, 893 F.3d at 1033–34. We find prejudice if
"counsel could have strengthened the preparation of the case
in a manner reasonably likely to alter the outcome," *Pruitt*, 503
F.3d at 660, but as noted above, we reject claims of prejudice
"when it is clear that counsel could have done nothing to sal-
vage the plaintiff's case." *Eagan*, 987 F.3d at 687.

The question of prejudice in a recruitment-of-counsel case
does not ask merely whether a recruited lawyer would have

done a better job of presenting a plaintiff's case to the jury. We assume the answer to that question is always yes. Instead, the question is whether recruited counsel would have been reasonably likely to produce a better outcome for the prisoner-plaintiff. See *Jackson v. Kotter*, 541 F.3d 688, 701 (7th Cir. 2008) ("speculating about how counsel might have done a better job prosecuting the case is neither necessary nor appropriate" (quoting *Johnson v. Doughty*, 433 F.3d at 1008)). We consider both the substance and the process of the trial of Wand's deliberate indifference and negligence claims against Nurse Kramer.[6]

1. *Trial Evidence*

The decisive problem for plaintiff is the inconsistency between his pretrial statements and his trial testimony about what he told Nurse Kramer about the location and nature of his abdominal pain in their first encounter on February 13. As noted, he saw her for the second time at about 5:45 pm on February 14. By then he was complaining of continuing severe abdominal pain, his vital signs had deteriorated from the day before, and most important, he was complaining of severe

---

[6] The "reasonable likelihood" standard for prejudice echoes the "reasonable probability" standard for claims of ineffective assistance of counsel in criminal cases. A convicted defendant need not show it is more likely than not that the outcome would have been different. He must show instead a "reasonable probability" of a better outcome, which is "a probability sufficient to undermine confidence in the outcome," meaning a "substantial" likelihood of a different result, not just a "conceivable" possibility. *Harrington v. Richter*, 562 U.S. 86, 104, 112 (2011), quoting *Strickland v. Washington*, 466 U.S. 668, 693–94 (1984). In *Harrington*, the Supreme Court added that the difference between the *Strickland* prejudice standard and a more-probable-than-not standard is "slight and matters 'only in the rarest case.'" *Id.* at 112, quoting *Strickland*, 466 U.S. at 697.

pain localized in the lower right quadrant of his abdomen, a clear symptom associated with appendicitis. Within minutes, he was on his way to the local hospital where he had emergency surgery to remove his burst appendix. Wand has no claim under the Eighth Amendment or state negligence law concerning Kramer's treatment of him on February 14.

So we focus on February 13. The defense evidence from Kramer was that Wand presented with complaints of vomiting (eleven times since 11:30 the night before), nausea, and stomach pain that he rated ten on a scale of one to ten. Kramer checked Wand's vital signs. His temperature, pulse, respiration, and blood pressure were all normal. He was holding his stomach in pain. She examined his abdomen, which was soft rather than distended, and she heard bowel sounds in all four quadrants of his abdomen. Wand seemed dehydrated from vomiting, and Kramer concluded he probably was suffering from gastroenteritis. She ordered ice chips (not ordinarily allowed to prisoners) so that he could take in some water, as well as acetaminophen for pain, Pepto-Bismol to settle his stomach, a clear liquid diet for two days, and no work or recreation for two days. She scheduled a follow-up visit for two days later and told him to contact the health unit if his symptoms worsened. If that evidence is credited, there is no basis for finding either deliberate indifference or negligence on the part of Nurse Kramer.

Plaintiff Wand's version of the February 13 examination and treatment has been inconsistent on one key fact. In his verified complaint and in discovery, he said that he complained to Nurse Kramer on February 13 of severe pain localized in the lower right quadrant of his abdomen. That evidence was critical for the district court's decision to deny

summary judgment on his claims against Nurse Kramer. See *Wand*, 2021 WL 311285, at *6–7.

At trial, however, Wand's story changed. He testified—as Nurse Kramer also testified—that he did *not* complain of lower right quadrant pain during that February 13 examination. The subject was addressed several times. His trial answers were clear and consistent. We see no signs of confusion or ambiguity in the transcript. In his direct testimony, presented in narrative form, Wand did not claim that he told Kramer about lower right quadrant pain on February 13. Perhaps that omission might be explained away as the effect of nerves during trial. But defense counsel focused on the question in cross-examination:

> Q You never told Ms. Kramer that you had pain on your lower right side on Tuesday [February 13]; correct?
>
> A Right.
>
> Q Because the pain on Tuesday was in your stomach; correct?
>
> A Yes.
>
> Q But the next day on Wednesday, February 14th, your pain moved to the right side?
>
> A Yes.

Dkt. 457 at 38–39.

Defense counsel then turned to February 14:

> Q  And you recall that Nurse Kramer noted the
>     onset of pain around 3:30 to 4 o'clock that
>     day; correct?
>
> A  Yes.
>
> Q  Okay. And that's when you began experi-
>     encing a sharp pain on your right side; cor-
>     rect?
>
> A  Yes.

*Id*. at 42. There followed a confusing and ultimately immate-
rial exchange about when plaintiff first thought he had appen-
dicitis and when he first told Kramer he thought it was ap-
pendicitis.[7]

The questioning then returned to the pain:

> Q  And you thought it was appendicitis be-
>     cause the pain was on your right side on the
>     14th; correct?
>
> A  Yes.

*Id*. at 46. When plaintiff had an opportunity to offer what was
in effect redirect testimony, he made no effort to correct his
answers about his pain having moved to the lower right quad-
rant on February 14. At no later time in the trial did he argue

---

[7] In those pages of the transcript, the judge stepped in to steer the trial
toward proper questions and to prevent the defense attorney from trying
to impeach Wand improperly and from trying to argue with him. Dkt. 457
at 43–46.

anything different or indicate his testimony had been mistaken on this critical point.

### 2. *Effects of Plaintiff's Trial Testimony*

That change in Wand's story proved to be pivotal. At the close of evidence, the defense moved for judgment as a matter of law. The judge commented on the difference between the summary judgment evidence and the trial evidence, but he decided prudently to go ahead and have the jury deliberate. The judge explained to Wand: "It seems pretty clear now that you did not report lower right-quadrant pain until the 14th and that when you did, Nurse Kramer referred you to the hospital." Plaintiff did not indicate any disagreement or confusion on that point.[8]

Before trial, Wand would have had two potential paths to show liability under both the Eighth Amendment and state negligence law. One path was to show that he complained to Nurse Kramer on February 13 of appendicitis symptoms—especially severe pain localized in his lower right quadrant. That theory probably would not have required any expert testimony. From the testimony of both Kramer and her

---

[8] During oral argument on appeal, counsel for Wand indicated that the judge's decision to submit the case to the jury rather than to grant judgment as a matter of law under Federal Rule of Civil Procedure 50(a) showed the substantial merit of the case. In view of both Wand's testimony and the judge's comments about why he was sending the case to the jury, that action does not persuade us the case had merit. The judge gave every indication that plaintiff's own trial testimony meant his claim against Nurse Kramer could not succeed. Once the time and resources have been committed to a jury trial, however, it is often more prudent to allow the jury to deliberate rather than risk a need for a new trial by prematurely resolving the case as a matter of law.

supervisor Waterman, the jury would have understood that localized lower right quadrant pain would have been a clear symptom of appendicitis calling for an emergency response, not ice chips, Pepto-Bismol, and acetaminophen. If Wand had testified that he reported such pain on February 13, his claim against Nurse Kramer would have presented a fairly straight-forward credibility contest, as the district judge had expected in denying summary judgment for Kramer. But Wand's own trial testimony effectively blocked that path.

The second path might have been for Wand to show that his symptoms on February 13—without the lower right quadrant pain—called for a much more aggressive response from Nurse Kramer. Possible responses might have included sending plaintiff immediately to the hospital or at least contacting a supervising physician to see if a more aggressive response was needed. All agree that showing either deliberate indifference or negligence under such facts would have required some expert testimony about the standard of care and evidence that Nurse Kramer breached the standard of care.

On appeal, Wand has tried to show he would have had a reasonable prospect of prevailing on one or both paths if the district court had recruited counsel for him. We are not convinced.

On the first path—that he told Nurse Kramer of lower right quadrant pain on February 13—Wand's appellate counsel argue that a lawyer could have had him better prepared for cross-examination or could have had him testify about his prior statements in which he swore that he did tell Nurse Kramer of lower right quadrant pain on February 13. We do not see any reasonable likelihood of a different result on this path. As noted above, Wand's trial testimony on this critical fact

was clear and consistent. There is no sign of confusion or an unreliable memory. It also is not obvious to us how his prior inconsistent statements would even have been admissible if Wand himself had offered them. And if they had been offered with the help of counsel, he would have been impeaching himself on *the* critical issue in what would have been for him at best a credibility contest.

Plaintiff's trial testimony probably surprised both the judge and defense counsel, but it was what it was. It was so clear on the critical point that we do not see a reasonable likelihood that he could have credibly rehabilitated his older story even if he had been able to put his prior statements before the jury. Nor do we think we can find prejudice on the theory that plaintiff's sworn trial testimony was just wrong. We are making that pragmatic judgment in light of the trial evidence and our experience as judges and lawyers. When a party contradicts himself on such a critical factual point, the version less favorable to his case is, other things being equal, more likely to be believed by a fact-finder. And this was no minor inconsistency. It was a direct contradiction on the central fact in the case. To borrow from tort law and traffic accidents, it was as if Wand initially said that he had a green traffic light but testified at trial that his light was red.

The second path—possible expert testimony that Nurse Kramer breached the standard of care, whether deliberately, recklessly, or negligently—is no more promising. Wand argues that recruited counsel would have been able to locate a medical expert (physician or nurse or nurse practitioner) who would have been able to testify credibly that Nurse Kramer breached a professional standard of care even without complaints of lower right quadrant pain. In theory, such a

hypothetical expert might have been able to support both Wand's Eighth Amendment and medical malpractice theories. Both theories would require proof of at least a breach of a professional standard of care. See *Carney-Hayes*, 284 Wis. 2d 56, ¶37 (Wisconsin medical malpractice law); *Brown v. Osmundson*, 38 F.4th 545, 551–52 (7th Cir. 2022) (deliberate indifference in appendicitis case).[9]

We have no reason to think that such a hypothetical expert could have been found. Nothing in the trial record suggests that Nurse Kramer breached any standard of care. The only indications of a standard of care in the trial record come from Nurse Kramer's own testimony and from the Nursing Protocols of the Wisconsin Department of Corrections, which she was supposed to follow. Those were admitted into evidence through supervisor Waterman, who testified that Nurse Kramer's actions on February 13 were consistent with those protocols, taking as a given her version or plaintiff's trial version of their encounter that day.

In this analysis of prejudice, we are not limited to only the record of the actual trial. We are trying to compare the actual trial to a hypothetical trial with recruited counsel. But is there

---

[9] To be clear, deliberate indifference under the Eighth Amendment demands more than medical malpractice. It may be inferred "based upon a medical professional's erroneous treatment decision only when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Estate of Cole v. Fromm*, 94 F.3d 254, 261–62 (7th Cir. 1996). The most important difference between the theories is usually the defendant's state of mind. See *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc) (distinguishing between theories).

any other reason to believe that Nurse Kramer's actions breached a standard of professional care on February 13? No one has identified any standard of care in public sources that would support such a conclusion. Counsel for Wand suggested that medical experts in other cases testified that the standard of care for symptoms like Wand's called for a different response from a nurse.

With one exception that we discuss next, we have not been directed to any experts in other cases who testified in ways that offered any hope for Wand's theory in this case. The principal relevant teaching in our own case law is that appendicitis can be hard to diagnose in its early stages because its symptoms are consistent with a number of other disorders. See *Brown*, 38 F.4th at 551–52 (affirming summary judgment for defendants; "appendicitis is difficult to diagnose;" defendant doctor monitored plaintiff for three days, and even then an emergency room doctor noted that symptoms were general rather than specific to appendicitis); *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000) (reversing summary judgment for defendants; whether plaintiff's symptoms over fourteen days, which defendants recognized could be appendicitis, should have prompted more aggressive response was disputed factual issue).

The one possible exception that Wand identifies is *Rivera v. Kettle Moraine Correctional Institution*, No. 14-C-6, 2016 WL 2766642 (E.D. Wis. May 12, 2016), a case cited by the district court here when denying summary judgment for Nurse Kramer. The case is factually close to this case. It offers Wand's best argument for prejudice, but close attention shows two decisive differences between that case and this one.

Rivera was a prisoner who complained to prison nurses of severe abdominal pain. Not quite 48 hours later, he was sent to a hospital for emergency surgery for a ruptured appendix. *Id.* at *1–2. The district court granted plaintiff Rivera's motion for recruitment of counsel and later denied defendants' motion for summary judgment. The evidence showed that when Rivera first saw a nurse complaining of severe abdominal pain, "[t]hroughout the evaluation, Plaintiff was hunched and grabbing the right side of his abdomen." That evening, he again saw a nurse, and he was "bent over at the waist grasping the right side of his abdomen." The next morning, he saw another nurse. He was again "bent over at the waist grasping the right side of his abdomen." He asked several more times that day to see a nurse or doctor, but prison medical staff refused his requests as relayed by correctional officers. That same afternoon, less than 48 hours after his first examination, he was found unconscious on the floor of his cell. He was then sent immediately to a hospital where emergency surgery was performed the next day.

Recruited counsel for Rivera located and offered the testimony of a medical expert, Dr. Holmburg, who opined that the nurse who saw Rivera the morning before his collapse and emergency trip to the hospital "should have sent Plaintiff to the emergency room for urgent medical care and that the failure to do so was a reckless indifference to Plaintiff's serious medical need." 2016 WL 2766642, at *4. The result, according to the expert, was prolonged suffering and likely the rupturing of the plaintiff's appendix before surgery could be performed.

Given the substantial similarities to this case, appellate counsel for Wand argue that *Rivera* indicates a reasonable

likelihood that recruited counsel for Wand could have similarly identified a medical expert to offer comparable testimony here. Two critical differences between the cases undermine that theory.

First, the plaintiff in *Rivera* was HIV-positive, and the defendant nurses knew it. The Abdominal Pain Nursing Protocol for the Department of Corrections instructed "that an inmate who is suffering from severe abdominal pain and also has an HIV diagnosis should be referred to a doctor on an urgent basis." 2016 WL 2766642, at *2. There is no indication of any similar complication in Wand's case, nor is there any evidence that Nurse Kramer's actions departed from department nursing protocols.

Second, the evidence in *Rivera* showed that in each encounter with the nurses, the plaintiff was clutching the right side of his abdomen, making the risk of emergency appendicitis obvious. See also *Brown*, 38 F.4th at 551 (affirming summary judgment for defendants where plaintiff had not shown classic symptoms of appendicitis: fever, chills and "abdominal guarding").

We are not surprised that counsel for Rivera found an expert who supported his case, but given those differences, we cannot extrapolate to find that a second recruited lawyer would have had a reasonable prospect of doing the same for Wand. According to his own trial testimony, he reported pain on February 13 in his stomach area, above the navel. He did not have localized pain around his appendix, nor did he have a fever or chills or other conditions comparable to Rivera's HIV. He also did not have evidence that Nurse Kramer breached any nursing protocol.

The natural rejoinder to this analysis is that we simply cannot know what might have happened if counsel had been recruited for Wand and, perhaps with financial assistance from the court, tried to locate an expert willing to support his claim. That's true, but this theory is just speculation and would prove too much. Without a more discriminating approach, if the sheer speculative possibility of locating a supportive expert were enough to find prejudice, we would come very close to holding that any pro se prisoner who suffered a serious adverse health outcome would be *entitled* to recruited counsel and enough cash to try to hire an expert.

We have repeatedly rejected such a principle, and it would be a serious mistake to adopt it, particularly given the volume of such prison health-care cases and the wide range of the merits of such cases, from frivolous to deadly serious. In short, *Rivera* does not convince us that a second recruited counsel would have given Wand a reasonable likelihood of prevailing against Nurse Kramer.[10]

A deeper look at the *Rivera* case also shines a useful light on the choice to recruit counsel in a prisoner's medical care case, and in particular in a case claiming late diagnosis of

---

[10] Perhaps another alternative might be court appointment of a neutral expert. See *Rowe v. Gibson*, 798 F.3d 622, 631–32, 634 (7th Cir. 2015) (encouraging district judges to recruit neutral experts in prison health-care cases and suggesting—somewhat optimistically—that it seemed "unlikely that a gastroenterologist would charge more than a nominal fee" to provide an opinion that seemed obvious to author of majority opinion). To our knowledge, however, we have not held before that a district court was *required* to recruit and appoint a neutral expert. Compensation of neutral experts can also pose knotty problems, as Judge Conley explained in *Goodvine v. Ankarlo*, No. 12-CV-134-WMC, 2013 WL 1192397, *2 (W.D. Wis. Mar. 22, 2013).

appendicitis. At the outset of the *Rivera* case in 2014, the district court wrote an opinion on that question. *Rivera v. Kettle Moraine Correctional Institute*, No. 14-C-6, 2014 WL 2875897 (E.D. Wis. June 24, 2014). Judge Griesbach fully appreciated the difficulties posed by the case, so he tried a novel approach. He asked a lawyer known to specialize in personal injury work, including medical malpractice, to evaluate the case as if Rivera were not a prisoner "to determine whether it was the kind of case in which the members of his firm would be willing to invest the time and resources that would be required to handle the case, realizing that actual attorney fees and costs would be recoverable in the event the plaintiff prevailed." *Id.* at *2.

The firm's medical malpractice team, comprised of both attorneys and paralegals with nursing degrees, concluded that the case did not warrant the kind of investment that would be required to handle the case. The report to the court included observations that seem to apply directly here:

> Appendicitis can be difficult to diagnose in its earlier stages. Initially, symptoms can be somewhat vague and include generalized aching abdominal pain across the entire abdomen. This pain will then progress to become more right sided abdominal pain. Symptoms can also include nausea, vomiting, diarrhea, and lack of appetite. In addition, patients will develop a fever. The challenge in diagnosis is that these symptoms can also be attributed to a gastrointestinal infection and, as a result, appendicitis is often misdiagnosed. In our opinion, it would be very difficult to prove medical negligence for

the delay in the diagnosis of appendicitis. Al-
though Mr. Rivera was having significant ab-
dominal pain, that was not relieved with antac-
ids, and saw the RN several times over 2–3 days,
he was afebrile and his pain was initially gener-
alized. Once he stated he was having right sided
abdominal pain, he was transferred to the hos-
pital.

*Id.* at *2.[11]

The firm also noted that potential damages would not be
sufficient to justify the cost required to prosecute the case. Ri-
vera would have needed surgery in any event, and he suf-
fered no long-term effects from the delay. Also, he lost no
wages and incurred no medical expenses. The firm later sup-
plemented its report regarding the prospect of obtaining ex-
pert testimony to support the case. The case would require
hundreds of hours of attorney and paralegal time, and the
cost of experts and out-of-pocket expenses more than ten
years ago "could easily exceed $100,000 through trial." *Id.*

Judge Griesbach wrote in restrained prose that this evalu-
ation "raises substantial questions about the wisdom of the
court recruiting counsel," and he raised further questions
about whether such efforts on behalf of one side in a case,
which would impose further expenses on the defendants,
would be consistent with the court's duty of impartiality. *Id.*
In *Rivera* in 2014, however, Judge Griesbach read our decision

---

[11] To be fair, that assessment did not refer to Rivera's HIV status,
which later turned out to be critical for the expert's opinion and for the
court in denying summary judgment. But this assessment fits Wand's case
quite closely.

in *Pruitt* as preventing him from considering the merits and substance of the case in deciding whether to recruit counsel, which he contrasted with the precedents from other circuits. *Id*. at *4–6. He concluded that this court would likely deem denial of recruited counsel for Rivera to be an abuse of discretion, so he reluctantly decided to recruit counsel but without requiring counsel to retain experts at their own expense. *Id*. at *8.[12]

Our principal point for this case is that *Rivera* provides no basis to conclude that recruiting another lawyer for Wand would have been reasonably likely to lead to a supportive expert whose testimony would have altered the outcome at trial. Our secondary point is that in assessing how best to marshal the limited time and resources of generous volunteer counsel, such practical assessments of likely costs and potential benefits can offer relevant guidance for district courts.

### 3. *Fairness of the Trial?*

We close with some observations about the trial process itself. Appellate counsel for Wand emphasize the difficulties Wand had in presenting his case. He did not know the rules of evidence. He had difficulty in questioning witnesses. He often succumbed to the temptation to argue with witnesses or to have discussions with them rather than question them. He did not know how and when to object to the defense evidence.

---

[12] Some years after that opinion in *Rivera*, we issued opinions making clear that a district court may indeed consider the likely merits of the case when deciding whether to recruit counsel. See *Watts v. Kidman*, 42 F.4th 755, 763–65 (7th Cir. 2022) (noting this approach is consistent with other circuits); *McCaa II*, 959 F.3d at 845.

These were all problems common to many pro se parties (and many attorneys inexperienced with federal trials).

We know in general terms that Wand had stuttering problems, but it is hard to gauge the severity. In opening statements, Wand was reading from a text. His stuttering was bad enough that the judge stepped in and offered to read his opening statement to the jury. In content, the opening statement was clear and concise. The night before closing arguments, the judge told Wand he had noticed that his stutter worsened when he was trying to read, and he suggested that Wand speak from an outline in closing arguments. Wand seems to have done so, with enough success that at least the judge did not repeat the reading process from openings. And, to Wand's credit, the closing argument was focused and coherent.

Appellate counsel for Wand are highly critical of Judge Conley's efforts to accommodate Wand's limitations during trial, criticizing him for often interrupting the questioning of witnesses with his own questions. A reading of the full trial transcript presents in our view, however, a different picture.

First, the judge was not a passive observer of this trial. He was working hard to enable both sides to present admissible evidence to the jury with as much clarity as possible, and to do so without wasting jurors' time. That active role requires a delicate balance between patience and efficiency, and in being fair and appearing fair to both sides while taking steps that help the pro se party without showing bias or favoritism. Yes, the judge interrupted Wand's questioning often to clarify the testimony, to keep inadmissible testimony out, and to focus on what mattered for the substance of Wand's claims and Kramer's defense. But the judge took similar steps when defense lawyers were questioning witnesses. See, e.g., Dkt. 449 at 56–

57; Dkt 448 at 89–91, 95–100; Dkt. 457 at 43–46, 68–69, 80–81. Not as often as with Wand, of course, but commensurate with the need. The judge's active role in the trial does not persuade us that Wand was prejudiced to the extent that we could find that recruitment of another lawyer for him would have been reasonably likely to lead to a different outcome in the trial.

The judgment of the district court is AFFIRMED.